UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 322 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| EDWARD M. BURKE, | ) | |
| PETER J. ANDREWS, and | ) | |
| CHARLES CUI | ) | |

**GOVERNMENT'S NOTICE OF INTENT TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)**

The United States of America, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby respectfully provides notice of its intent to admit evidence pursuant to Federal Rule of Evidence 404(b).

**I.  BACKGROUND**

On May 30, 2019, a grand jury in this district returned a 19-count superseding indictment charging lead defendant and former Chicago Alderman Edward Burke as well as two others, his right-hand man, Peter Andrews, and businessman Charles Cui, with a string of bribery and graft-related offenses. R. 30. The superseding indictment alleges that between no later than 2016 and continuing through 2018, Burke used his positions as Alderman and Chairman of the Committee on Finance to solicit, attempt to solicit, and receive bribes from parties having business with the City of Chicago or subject to Burke's and fellow Alderman Daniel Solis's authority as Aldermen.[1] R. 30 ¶¶ 3, 4. Burke received and solicited these bribes in the form of

---

[1] Solis was identified as Alderman A in the superseding indictment.

fees arising from the retention of Klafter & Burke, as well as through private benefits for Burke's associates. *Id.* ¶ 4.

Count One of the superseding indictment charges Burke with racketeering and alleges that he engaged in five racketeering acts. Count One and the remainder of the superseding indictment, which alleges a subsidiary conspiracy and substantive offenses (including offenses alleging Burke sought to obtain bribes and gratuities), center around the following four episodes:

(1) Burke's repeated efforts to shakedown the developer of the Old Post Office in Chicago for legal work for his law firm;

(2) Burke's and Andrews' efforts to shakedown the owners of fast-food restaurants, including a fast-food restaurant in Burke's ward, again for work for Burke's law firm;

(3) Burke's acceptance of legal work from Cui, which was corruptly directed to Burke's law firm in return for his official assistance in obtaining a permit for Cui's business; and

(4) Burke's attempt to extort a local museum in order to obtain a job for the child of a personal acquaintance.

The four episodes are described briefly below.[2]

### A. Post Office Project Shakedown

Beginning in August 2016, Burke asked Solis to recommend Klafter & Burke to Individual A-1 to do tax work for Company A. R. 30 at ¶ 6. Solis was Alderman of

---

[2] For a summary of the facts underlying all five racketeering acts and the other offenses charged in the superseding indictment, please see the Government's Consolidated Response to Defendants' Pretrial Motions, R. 139 (under seal) and 140 (redacted version publicly filed), and the Court's Memorandum Opinion & Order denying defendants' pretrial motions, R. 196.

2

the 25th Ward and Chairman of the City of Chicago Committee on Zoning, Landmarks & Building Standards. *Id*. ¶ 1j. Company A, a New York-based real estate company, conducted extensive renovations on the Old Post Office, and Individual A-1 oversaw and managed the Post Office project on Company A's behalf. *Id*. On multiple occasions, Burke, acting with the expectation that Company A would retain Klafter & Burke, took official action to benefit Company A in the development and financing of the Old Post Office. *See id*. ¶¶ 5-32.

### B. Fast Food Restaurant Shakedown

In May 2017, Individual B-1, an executive of Company B, sought Burke's official assistance as an Alderman with obtaining a building permit for a fast-food restaurant located on South Pulaski Road in Burke's ward (the "restaurant"). *Id*. ¶ 34. In a series of communications, Burke attempted to obtain business for his law firm by tying his official assistance on the permit request to Company B providing his law firm with tax business. *Id*. ¶ 38. Company B received building permits from the City of Chicago Department of Buildings in June 2017 and September 2017. R. 30 ¶ 39. But, by October 2017, Company B had not yet provided Klafter & Burke with any tax business. *Id*. ¶¶ 39, 40. On October 24, 2017, Burke and Andrews agreed that, due to the failure of Company B to provide Burke's firm with tax work, Andrews would take action to interfere with the operations of the restaurant on the pretext that the restaurant did not have a driveway permit. *Id*. ¶ 40. The next day,

Andrews reported to Burke that he had put a stop to the restaurant's remodeling work. *Id.* ¶¶ 41-42.

After Company B applied to the City of Chicago's Department of Transportation for a driveway permit, Burke caused members of his staff, including Andrews, to obstruct approval of the application. R. 30 ¶ 44. After Company B buckled in response to Burke's and Andrews's pressure campaign and agreed to provide tax work to Klafter & Burke, Company B's driveway permit application was approved, and it was able to resume the remodeling of the restaurant. *Id.* ¶¶ 44-49.

### C. Pole Sign Permit

Cui was the managing member of Company C, which owned a property located at 4901 West Irving Park Road in Chicago (the "property"). R. 30 at ¶¶ 1o, 1p. On April 17, 2017, Cui submitted an application for a permit to the City of Chicago Department of Buildings to allow for Company D, which was to operate a retail store at the property, to use an existing pole sign outside the property. *Id.* ¶ 51. After the City of Chicago denied the permit, Cui contacted Burke to obtain Burke's assistance to obtain the pole sign permit. *Id.* ¶ 54. Soon thereafter, Cui told his existing property tax attorney that Cui needed to provide Burke with property tax work in order to obtain Burke's help with the pole sign permit. *Id.* ¶¶ 55, 56. After Cui retained Klafter & Burke for tax work and asked for Burke's official assistance with the permit, Burke took steps to attempt to influence other City officials to resolve Cui's pole sign permit application favorably. *Id.* ¶ 62-66.

4

### D. Museum Extortion

Burke abused his position as Alderman by threatening to derail a proposed admission fee increase by Museum 1 due to Museum 1's failure to respond to his efforts to find a job for the child of a personal acquaintance ("Individual E-1"). R. 30 at ¶¶ 1t, 69. In 2017, Museum 1's proposed admission fee increase required approval from the Chicago Park District. *Id.* ¶ 70. On September 8, 2017, Burke spoke with an employee of Museum 1 about the admission fee increase and threatened to contact the President of the Park District Board and object to the admission fee increase—simply because Museum 1 had failed to respond to his effort to obtain an internship position with the museum for Individual E-1. *Id.* ¶¶ 1t, 71. Museum 1 responded by identifying another full-time position open for Individual E-1's application. *Id.* ¶¶ 72-79.

## II. LEGAL STANDARD

Federal Rule of Evidence 404(b)(2) permits the use of evidence of other crimes, wrongs, or acts to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2); *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014). Before it will be admitted over an opponent's objection, the other-act evidence's relevance to a purpose other than the person's character or propensity to behave in a certain way must be "established by 'some propensity-free chain of reasoning.'" *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015) (quoting *Gomez*, 763 F.3d at 856, 860). "This is not

5

to say that other-act evidence must be excluded whenever a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Gomez*, 763 F.3d at 856 (emphasis in original).

Once the proponent of the evidence makes this showing, then the court "must engage in Rule 403 balancing to determine whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice." *Id.* "The more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote." *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (quotation omitted).

### III. EVIDENCE TO BE OFFERED PURSUANT TO RULE 404(B)

The government seeks to admit the evidence detailed below pursuant to Rule 404(b)(2). This evidence is highly probative of Burke's intent and motive (1) to use his and Solis's official positions to obtain legal business for Burke's private law firm from parties who were seeking to do business with the City and who were subject to approval from Burke and Solis's authority, and (2) to use his official position to take favorable official action on behalf his private clients. The probative value of this evidence substantially outweighs any unfair prejudice.

## A. Communication Related to Withholding of Driveway Permits

On June 6, 2017, Burke spoke to Individual F-1. Burke Phone, Session #831.[3] Burke and Individual F-1 discussed an event that Individual F-1 was hosting that evening and the attendees who would be present. Individual F-1 explained that he was hosting the event at a friend's new office space and that he expected "a nice turnout." *Id.* Individual F-1 then referenced a local construction company ("Company F"): "[Company F] was the contractor, you remember those guys?" *Id.* Burke responded, "Yeah, they're the ones that are doing the school at [a location in Burke's ward]." Individual F-1 replied, "Yeah, they're okay. Okay? They're not perfect. They're just pretty naive on this stuff, so we've had to drag their asses along the way, but we'll have a nice event." *Id.* Burke answered, "Well, maybe if they don't have any access to the property because the driveway isn't legal, they might get the message." *Id.* Individual F-1 laughed. The call concluded with Individual F-1 telling Burke when to arrive at the event, noting, "If you can spend an hour, it'll be good, people want to meet you, talk to you, make a few remarks, and then we'll have you on your way." *Id.*

The government intends to offer this interception to prove defendant Burke's intent, plan, and *modus operandi*. This communication demonstrates Burke's willingness to use a specific artifice—a pretextual challenge to a business's driveway

---

[3] The recordings cited herein are available upon request.

7

permits—as a means to extort benefits from the business. In particular, in this conversation, Individual F-1 advises Burke that Individual F-1 has experienced difficulty with Company F in relation to their participation with an event that Individual F-1 was planning. Burke identified that the use of a specific technique—denying a company access to their property on the pretext that they did not have appropriate driveway permits—was an effective means of extracting benefits from a business that was not compliant. Burke's explanation of this technique is powerful evidence of his intent to extract business from Company B by throwing up obstacles to the continued operation of its restaurant on account of a purported driveway permit issue.

### B. Burke's Attempts to Solicit Tax Work from Company G

On October 27, 2016, Burke and Solis met with Individual A-1 and Burke solicited tax work for his law firm from Company A. Immediately following the meeting, Burke had a private conversation with Solis in which Burke discussed his desire and intention to obtain tax business from other developers with business before Solis, including Company G. *See* 10/27/16 In-Person Recording, 1D134.

The government gives notice of its intent to offer evidence of the conversation that occurred after the meeting with Individual A-1 concluded, which related to Burke's efforts to obtain business from Company G, another Chicago-based developer. Specifically, after the pitch meeting with Individual A-1 ended, Solis asked, "What'd you think?" Burke said: "From what I hear, they're [Company A] the real deal." *Id.*

8

Solis said: "Yeah, they're pretty good. Um, the last time we met, you got me thinking a little bit. I've got my [child] at [a private school in Chicago]. I got a big mortgage. You talked about marketing.[4] So if there are any thoughts that you have on that I'd appreciate it." *Id*. Burke responded by clarifying that he was interested in "[a]ny potential clients, not just these guys [Company A]. Who else is, uh, like, uh, is [Individual C-1] doing some stuff?" *Id*. Solis confirmed he was working with Individual C-1 on developments in Solis's ward and also referenced Individual G-1, who was the president of Company G. *Id*. Burke said that Klafter & Burke had "done one assignment for [Company G] where we really hit the ball out of the park for them, so I don't know why he [Individual G-1] doesn't give us more work." *Id*. Solis replied, "Let me talk to him." Burke said, "If you can tee him [Individual G-1] up, then you can be our consultant." *Id*. Later in the same meeting, Burke told Solis, "Alright, I'll get out of your hair. Thank you. So, let's try to do some business, huh?" Solis said: "I will. I will. And let's, let's next time we talk, if you can give me some ideas on how I can be part of this consulting thing." *Id*. Burke said: "Yeah. And any, any other developer . . . ." Solis responded: "There's a lot, a lot of developers." Burke replied: "They all, ah, they all need somebody that does what I do." *Id*.

---

[4] Solis was referencing a prior telephone call with Burke, which occurred on August 26, 2016, in which Burke told Solis that if Solis could secure legal work for Burke's law firm, "then we can certainly talk about a marketing arrangement for you [Solis]." R. ¶ 6. Burke and Solis again discussed a potential marketing arrangement for Solis if he obtained business for Burke during a recorded meeting on September 26, 2016, at which time Burke told Solis that Burke was "a believer in sharing the wealth." *Id*. ¶ 7.

9

The statements outlined above are evidence of Burke's intent, plan, and motivation to solicit clients for Klafter & Burke through use of his and Solis's official positions. They specifically demonstrate Burke's interest in soliciting clients who were property developers, such as Company G, that had business before Solis and were subject to Solis's authority as Alderman of the 25th Ward and Chairman of the Zoning Committee to obtain tax work for Burke's law firm.

### C. Burke's Solicitation of Tax Business Through Other Public Officials

On August 1, 2017, Burke spoke to the mayor of a town in the Chicagoland area ("Mayor H"). After a brief discussion about other topics, Mayor H stated, "…And then, um, let's set up a time when we can talk because you said you wanted to be able to, uh, access some of these people that are building things in [name of Mayor H's town] for purposes of tax appeals." Burke responded, "Yeah." Mayor H said, "Okay." Burke stated, "Okay, uh, we'll talk. Thanks."

This communication shows that Burke sought out other public officials, not just Solis, to solicit prospective Klafter & Burke clients among those who had business before the public official, with a particular focus on targeting real estate developers that might hire his law firm for representation in tax abatement proceedings.

## IV. CONCLUSION

For the reasons set forth above, the government respectfully asks the Court to admit this evidence pursuant to Federal Rule of Evidence 404(b), as it is relevant to

a non-propensity purpose and its probative value is substantially outweighed by a danger of unfair prejudice.

        Respectfully submitted.

        MORRIS PASQUAL
        Acting United States Attorney

By:    */s/ Sushma Raju*
        AMARJEET S. BHACHU
        DIANE MacARTHUR
        SARAH STREICKER
        TIMOTHY J. CHAPMAN
        SUSHMA RAJU
        Assistant United States Attorneys
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300