**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | No. 19 CR 322 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| EDWARD M. BURKE, ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Former Alderman Edward Burke has a storied career in Chicago politics. Yet, this case solely concerns his discrete actions between 2016 and 2018. On May 30, 2019, a federal grand jury indicted Burke on fourteen corruption-related counts involving a typical pay-to-play scheme, abusing his position to drive business and fees towards his private legal practice. (Dkt. 30). The charges center on four factual "episodes" from 2016 to 2018 involving: (1) the Old Post Office; (2) a Burger King restaurant; (3) Pole Sign in front of a Binny's liquor store; and (4) a job at the Field Museum. Following a six-week trial, a jury convicted Burke on all but one of those counts. (Dkt. 392). At the close of evidence, Burke moved for a judgment of acquittal on charges related to the Field Museum episode. (Dkt. 378). Burke now moves for a judgment of acquittal on various other counts and for a new trial. (Dkt. 455). For the following reasons, Burke's motions [378, 455] are denied. The jury's verdict stands.

**BACKGROUND**

Edward Burke is the longest-serving member of Chicago's City Council, serving as both the 14th Ward Alderman from 1969 to 2023 and the Council's Chairman of the Committee on Finance from 1989 to 2019. Concurrently, he also owned a private law firm, Klafter & Burke, that represented clients in property tax assessment contests and appeals. Though Burke was in office for over fifty years, this case concerns actions taken at the tail end of his career.

A May 30, 2019, a grand jury alleged in a Superseding Indictment alleged Burke exploited his authority as alderman and chairman to gain business for his law firm in exchange for securing official favors such as tax breaks and permits from the City of Chicago. (Dkt. 30 ¶¶ 1–4; Dkt. 196 at 1). The Superseding Indictment charged Burke with fourteen counts of racketeering, federal program bribery, attempted extortion, and the use of interstate commerce to further such violations. It also charged Burke's associate, Peter Andrews, and businessman Charles Cui with additional corruption-related counts.

The charges centered on four "episodes" where Burke exploited his position on the Chicago City Council: the (1) Post Office; (2) Burger King; (3) Pole Sign; and (4) Field Museum. These episodes are the bases for the five Racketeering Acts—each containing multiple subparts—charged in Count One and undertaken by Burke with the common goal of conducting the affairs of the City of Chicago by means of a pattern of racketeering.[1] *See* Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). To be guilty of Count One, the jury had to find that Burke undertook a pattern of racketeering activity, meaning in part that he

---

[1] Racketeering Acts 1 and 2 relate to the Post Office; Racketeering Act 3 relates to Burger King; Racketeering Act 4 relates to the Pole Sign; and Racketeering Act 5 relates to the Field Museum. The Indictment charged Burke with violating federal and Illinois state law predicates that underpin Count One and the Travel Act charges: 720 ILCS 5/33-1 (Bribery); 720 ILCS 5/33-3(a)(4) (Official Misconduct); ILCS 5/29A (Commercial Bribery); 18 U.S.C. § 1952(a)(3) (Travel Act); 18 U.S.C. § 1951(a) (Hobbs Act).

committed at least two of the Racketeering Acts. (*See* Dkt. 384 at 36); 18 U.S.C. § 1961(5). In turn, each Racketeering Act required the jury to find Burke committed certain federal and state law predicates acts.[2] The jury convicted Burke on Count One, finding that he committed sufficient predicate acts to satisfy each of the five Racketeering Acts. (*See* Dkt. 392). The remaining twelve counts charged Burke with attempted extortion in violation of 18 U.S.C. § 1951(a), federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B), and the use of interstate commerce in furtherance of such activity in violation of 18 U.S.C. § 1952(a)(3). The convictions against Burke and his various challenges are laid out below.

| Count | Episode | Violation(s) | | Description | Challenge |
|-------|---------|-------------|---|-------------|-----------|
| **1** | | 18 U.S.C. § 1962(c) | | | |
| | Post Office | Racketeering Act 1 | 1(a) – 720 ILCS 5/33-1(e), ILCS 5/8-4 | Attempted Bribery | Rule 33 |
| | | | 1(b) – 720 ILCS 5/33-3(a)(4) | Official Misconduct | Rule 33 |
| | | | 1(c) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 29 |
| | | | 1(d) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 29 |
| | Post Office | Racketeering Act 2 | 2(a) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 33 |
| | | | 2(b) – 720 ILCS 5/33-3(a)(4) | Official Misconduct | Rule 33 |
| | Burger King | Racketeering Act 3 | 3(a), 3(c)–(g) | Travel Act, Attempted Extortion, Attempted Bribery, Official Misconduct | Not Challenged |
| | Pole Sign | Racketeering Act 4 | 4(a) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 29 |

---

[2] The listed state and federal laws underpinning each Racketeering Act are the "predicate acts" under § 1962(c). Committing at least two enumerated predicate crimes within 10 years forms the foundation for violating Count One. 18 U.S.C. § 1961(5). Some of the predicate offenses also are separately charged as offenses.

|  |  |  | 4(b) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 29 |
|---|---|---|---|---|---|
|  |  |  | 4(c) – 720 ILCS 5/33-1(d) | Bribery | Rule 29 |
|  | Field Museum | Racketeering Act 5 | 5(a) – 18 U.S.C. § 1951(a) | Attempted Extortion | Rule 29 |
|  |  |  | 5(b) – 18 U.S.C. § 1952(a)(3) | Travel Act | Rule 29 |
| 2 | Post Office | 18 U.S.C. § 666(a)(1)(B) |  | Bribery – Solicitation | Rule 33 |
| 3 | Post Office | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Rule 29 |
| 4 | Post Office | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Rule 29 |
| 5 | Burger King | 18 U.S.C. § 1951(a) |  | Attempted Extortion | Not Challenged |
| 7 | Burger King | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Not Challenged |
| 8 | Burger King | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Not Challenged |
| 9 | Burger King | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Not Challenged |
| 11 | Pole Sign | 18 U.S.C. § 666(a)(1)(B) |  | Bribery – Accepting | Rule 29 |
| 15 | Pole Sign | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Rule 29 |
| 16 | Pole Sign | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Rule 29 |
| 18 | Field Museum | 18 U.S.C. § 1951(a) |  | Attempted Extortion | Rule 29 |
| 19 | Field Museum | 18 U.S.C. § 1952(a)(3) |  | Travel Act | Rule 29 |

## I.    Relevant Factual Summary of the Episodes

The Court assumes familiarity with the sprawling facts of this case from its previous rulings. (*See* Dkts. 196, 287). To state all the evidence presented would be tantamount to rehashing the six-week trial. For efficiency and clarity, the Court recounts the evidence pertinent to Burke's arguments and a basic understanding of the events. As Burke does not challenge counts related to the Burger King episode, it is not reprised below.

4

### a. Field Museum

At trial, the jury heard evidence that Burke abused his position to acquire a paid position at the Field Museum of Natural History for his goddaughter, Molly Gabinski. In July 2017, Burke called the Office of the President of the Museum, Richard Lariviere, to recommend Gabinski for a paid internship and had his assistant send her resume over after the call. (GX 261, 264). The Field Museum inadvertently met this outreach with silence.

Weeks later, on September 8, 2017, the Field Museum head of government affairs, Deborah Bekken, called Burke's office to schedule a meeting with him to discuss a pending proposal. (Dkt. 401 at 462–63; GX 91). The Field Museum proposed an admission fee increase before the Chicago Park District Board of Commissioners and Burke previously expressed opposition to such increases, causing embarrassment, bad press, and possible financial repercussions for the museums. (Dkt. 400 at 452–53; Dkt. 401 at 511, 587–88). From the jump, Burke expressed his displeasure with the Field Museum, stating he was "surprised to hear from you" since he never heard back on Gabinski's application. (GX 91). And he was "surprised" that the Field Museum was "now . . . gonna make a request of me." (*Id.*) He then stated, "I'm sure I know what you wanna do because if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal's gonna go nowhere." (*Id.*) Burke also asked if Bekken knew about his previous opposition, which was "a very sensitive matter." (*Id.*) Bekken agreed to follow up with Lariviere, President of the Field Museum, to "find out, um, what went wrong" and "fix it." Burke replied, "[w]ell, somebody better." (*Id.*; Dkt. 401 at 467).

Lariviere followed up with Burke that same evening: "[W]hen you call, Ed, everybody knows, we jump." (GX 92). Yet, after Lariviere offered to correct the situation, Burke noted that "that ship has already left the dock." (GX 92; Dkt. 401 at 623). Still, the Field Museum's executive

team met the next business day to discuss the "urgent" issue of Burke's call and Gabinski's application. (Dkt. 401 at 605–06; Dkt. 402 at 676–77).

Belying Burke's statement that the "ship has already left the dock," on September 11, 2017, he asked his assistant to follow up with the Museum regarding Gabinski. (GX 295). Lariviere then emailed Burke personally and offered Gabinski an opportunity to apply for a full-time job with the Museum that paid approximately $47,500 per year. (GX 294, 297, 426; Dkt. 402 at 683). After receiving the offer, Burke contacted Gabinski's mother, relayed the offer and offered to ask his assistant to inquire about the application process. (GX 299; Dkt. 400 at 415). Burke noted to Gabinski's mother that the paid position arose because the Field Museum called "asking me to help 'em on another matter [and] I read him the riot act." (GX 94). The Field Museum then emailed Gabinski to set up an interview for the position. (GX 300). Two days later, the Park District Board approved the admissions increase. (Dkt. 401 at 497:8–10). But on September 19, 2017, Gabinski turned down the job interview. (GX 307).

### b. Pole Sign

During this time, Burke also got involved with Defendant Charles Cui's pole sign permit. The jury heard evidence that in 2015, Cui entered into a lease agreement with Binny's Beverage Depot for a commercial property located at 4901 West Irving Park Road. (GX 407). Cui then obtained $2 million in tax increment financing ("TIF") funds from the City of Chicago to redevelop the commercial property.[3] (GX 410, 411). In exchange for the TIF funds, Cui had to lease the 4901 Property back to Binny's. (GX 414). In that lease, Cui gave Binny's the exclusive right to use the pole sign in front of the property. (GX 407). Binny's applied to the Chicago Department of Buildings ("CDOB") for a pole sign permit in April 2017, which was denied. (GX 453; *see* Dkt.

---

[3] TIF funding is a "special funding tool used by the City of Chicago to promote public and private investment across the City." (Dkt. 461 at 2). A Class L designation is a favorable tax designation. (*Id.* at 51).

427 at 3724–3728). After its denial, Cui entered into a lease addendum that gave Binny's a rent reduction if Cui did not obtain a pole sign permit by October 2017. (GX 424). The stakes were high: If Cui failed, he would lose about $750,000 in rent revenue over the lease period and potentially the TIF funds. (GX 270, 304).

The pole sign was in the 45th Ward. Yet, Cui chose to email Burke, the 14th Ward Alderman, in August 2017. (GX 270). Cui told Burke that the pole sign was "denied by zoning" for falling out of use, and "now is illegal." (*Id.*) He asked Burke to "look into the matter" and asked, "how to proceed" because he faced serious financial repercussions. (*Id.*) After hearing no response, Cui emailed Burke the following day and offered him tax appeal work for the Irving Park Road commercial property. (GX 273). Burke then replied that someone with his law firm would be in touch with Cui, (GX 274), and directed his assistant to reach out to CDOB Commissioner Judy Frydland to "see if she'd . . . review it and see if they . . . can . . . help [Cui]." (GX 88). Burke's assistant replied to Cui's original email and told him Frydland would reach out to him. (GX 270). On September 5, 2017, Cui entered into a contingency fee agreement with Klafter & Burke for the tax appeal work. (GX 427).

Burke also separately called Frydland on August 31, 2017. (Dkt. 425 at 3507–10; *see* GX 301). After he spoke to Frydland, Burke noted to his assistant that CDOB has "been trying to look into how to get [the permit approval] to work. But [Frydland] can't seem to figure out a way." (GX 95). Frydland suggested that Burke contact Zoning Administrator Patti Scudiero. (*Id.*; Dkt. 426 at 3538–40). After CDOB First Deputy Commissioner Matt Beaudet concluded the pole sign permit was not allowed, Burke contacted Scudiero to see if she could "look into," or review, the pole sign permit denial. (Dkt. 427 at 3728). Scudiero took no further action.

### c. Post Office

#### i. Amtrak

At trial, the jury heard evidence that in 2016, 601W—a New York-based developer—began redeveloping the Old Post Office building. (*See* Dkt. 409 at 1491). At that time, the Old Post Office was empty for approximately twenty years and was in significant disrepair. (*Id.* at 1463–66). To redevelop, 601W needed a Class L designation, TIF funding, and approvals from Amtrak and the City of Chicago Water Department. But those requirements proved difficult to obtain. Thus, Harry Skydell, the 601W manager for the redevelopment project, reached out to former alderman and government-cooperator Danny Solis, whose ward contained the Post Office.[4]

The jury heard recorded calls and saw emails between Solis and Burke that explained their scheme. Solis would help Burke's law firm receive legal work from 601W through his aldermanic connection to the redevelopment project. Then Solis would receive a portion of the generated legal fees via a consulting or marketing agreement with Burke's firm. In exchange, Burke would use his influence to move the Old Post Office project forward. (*See* GX 2, 13).

First, throughout the redevelopment, 601W had difficulty obtaining permits to access property owned by Amtrak located below the Old Post Office. (*See* Dkt. 409 at 1493–94, 1499). On October 27, 2016, Burke and Skydell met in Solis's City Hall office. (GX 5). Burke told Skydell about Klafter & Burke's ability to perform tax work for 601W. (*Id.*) They also discussed 601W's issues with obtaining Amtrak permits to access the track below the Old Post Office. (*Id.*) The jury heard evidence that during the meeting, Burke touted his connections, including with an Amtrak board member, who could assist Skydell with his project. (*Id.*)

---

[4] Solis began cooperating with the Government in 2016 after he was the subject of a federal investigation regarding his position as a public official. (*See* Dkt. 196 at 95).

In December 2016, Burke met with Ray Lang, Amtrak's government relations executive and President of Chicago Union Station Company. (Dkt. 410 at 1599, 1605–06; GX 505). Amtrak is a federally owned corporation, with its board members nominated by the President of the United States and confirmed by the Senate. (Dkt. 410 at 1597–99). Amtrak had stringent requirements for approvals to access the property located below the Post Office, creating tension with 601W. (*See id.* at 1610–13). Lang testified at trial that before meeting in Burke's City Hall office, he was "pretty convinced" the conversation would be about 601W's permits. (*Id.* at 1647–49). After meeting with Lang, Burke told Solis that 601W had not yet hired Burke's law firm and opined that Skydell would not do so "unless there's a reason." (GX 8). In other words, the hiring was contingent on Burke's assistance. Burke expressed frustration to Solis that his law firm had not yet been retained by 601W even though he was interfacing with Amtrak on 601W's behalf. (*See id.* (noting if 601W hired Burke's law firm, it would be "a different story"); GX 9 ("Alright, but I still haven't been retained."); GX 10 (expressing Burke's belief that he should not be "getting involved" unless 601W retained his firm); GX 11 ("So far . . . the cash register has not, uh, rung yet.")).

601W continued to need assistance with Amtrak approvals throughout the spring. In February 2017, Burke, Solis, and Lang toured Union Station where they discussed the permit issues between Amtrak and the Old Post Office. (Dkt. 410 at 1657; GX 12). Burke was "instrumental" in "put[ting] [the tour] together." (GX 12). Solis told Burke that Skydell was "really happy" the two were doing the tour and "he's definitely interested in giving you . . . law work." (*Id.*) In May 2017, Burke asked Solis again about the prospective legal work: "[D]id we land, the . . . tuna?" (GX 38). At the direction of law enforcement, Solis replied that Skydell and 601W had agreed to retain Burke's law firm for future tax appeal work. (*Id.*) On June 19, 2017, Skydell

continued to ask Burke for assistance resolving the Amtrak permit issues and noted, "I'd like to meet and see what business we can do too, I, you know, I want us to be a two-way street." (GX 50). Burke indicated he understood. (*Id.*) As a follow-up, Skydell emailed Burke with the pending Amtrak permit issues. (GX 254). Burke called Lang to convey the continuing permit issues and forwarded him Skydell's email. (Dkt. 410 at 1661–63). Burke then told Skydell that he met with Lang and that there was "a lot of progress" on the issues. (GX 55). Ultimately, in January 2018, Skydell offered Burke's law firm tax appeal work. (GX 124) (offering Burke's firm work on the Sullivan Center because "we're not forgetting about you"). They signed a contingent fee agreement in August 2018. (GX 445).

### ii. Water Department

For the Old Post Office project to move forward, 601W also needed approvals from the City of Chicago's Water Department. (*See* Dkt. 409 at 1497). Solis emailed Burke about the problem stating, "I think if we can take care of the water commissioner, we should be able to get the tax work and even get my consulting from you." (GX 13). Burke responded "Good. Let me take a look at it." (*Id.*) Burke then met with former Water Department Commissioner Tom Powers, who contacted then-Water Department Commissioner Barrett Murphy about the approvals. (Dkt. 409 at 1514, 1519–20; GX 230). Powers told Murphy there was "heat" from City Hall, and specifically Burke, to get the approvals sorted. (Dkt. 409 at 1548). Powers testified that Burke's outreach was unusual and concerning because he was a "very powerful alderman." (*Id.* at 1519, 1538). Murphy also testified that he understood Burke was "extremely intimidating" and to "make sure you could be as responsive as possible to any request that he had" so as not to face any negative impacts. (*Id.* at 1549, 1578). Murphy then continued to update Powers—who relayed the information to Burke—on the water service progress. (*See* GX 235). In March 2017, Burke told

Solis he got the "ball teed up" for 601W to meet with Murphy. (GX 15). In turn, Murphy told Powers he will "figure something" out with 601W. (GX 470).

### iii. Class L Designation and TIF Funding

Further, the jury heard evidence that 601W sought TIF funds and a Class L designation from Burke's Committee on Finance. (*See e.g.*, Dkt. 408 at 1373–74). In October 2017, Solis told Burke that Skydell was seeking TIF funding. (GX 101). Burke expressed he was not "fond of the way [601W] had conducted themselves up until this point" in not yet retaining Klafter & Burke for tax appeal work. (GX 104). Since Burke served as the Chairman and thus controlled the agenda, he wished 601W "good luck getting [the TIF funding]" in front of the Committee on Finance. (*Id.*; Dkt. 399 at 235:1–4). A few months later, Burke conceded that 601W's legal business "would help" Burke's efforts on both the Class L and TIF. (GX 129). Conveniently, after 601W agreed to retain Burke's law firm for tax appeal work, 601W sought and received the Class L designation. (GX 441). This tax designation was worth approximately $100 million. (*See* GX 127). In September 2018, after Klafter & Burke and 601W officially signed a contingent fee agreement, the Committee on Finance and City Council also approved the TIF funds for the Old Post Office project. (GX 447–48). Burke voted in favor of both. (GX 441, 448).

## II. Trial and Post-Trial Background

The trial spanned roughly six weeks. During trial, the Government called over 90 witnesses and presented close to 150 recorded conversations. At the conclusion of the evidence and the parties' arguments, the Court read the jury 326 pages of instructions. (Dkt. 384). After deliberating for approximately four days, the jury found Burke guilty of thirteen counts:

- Count One (all Racketeering Acts 1–5): RICO, 18 U.S.C. § 1962(c)
- Count Two: Bribery – Solicitation, 18 U.S.C. § 666(a)(1)(B)
- Counts Three, Four, Seven, Eight, Nine, Fifteen, Sixteen, Nineteen: Travel Act, 18 U.S.C. § 1952(a)(3)

- Counts Five and Eighteen: Attempted extortion, 18 U.S.C. § 1951(a)
- Count Eleven: Bribery – Accepting, 18 U.S.C. § 666(a)(1)(B)

The jury acquitted Peter Andrews on all counts related to the Burger King episode, the only episode in which he was named, and found Charles Cui guilty of five counts, including making false statements to the FBI, federal program bribery, and the use of interstate commerce to further such violations. Count Six—the only count in which Burke was acquitted—charged Burke and Andrews with conspiring to commit extortion related to the Burger King episode.

At the close of the Government's case, Burke filed a written motion for a judgment of acquittal as to the charges relating to the Field Museum episode (Counts Eighteen, Nineteen, Racketeering Acts 5(a) and (b)). (Dkt. 378); Fed. R. Crim. P. 29(a). After hearing oral argument, the Court took the motion under advisement. (Dkt. 432 at 4367:15–20). On February 21, 2024, Burke moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on various counts and for a new trial under Federal Rule of Criminal Procedure 33.[5] (Dkt. 455). On June 5, 2024, the Court heard oral argument on the parties' lengthy briefing. (*See* Dkt. 477).

## DISCUSSION

### I.     Rule 29 Motion for Judgment of Acquittal

#### a.   Legal Standard

A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction" either after the government has closed its evidence or within fourteen days after a jury has rendered a verdict. Fed. R. Crim. P. 29(a), (c)(1); *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). A court will overturn the jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of

---

[5] Defendant Cui filed separate post-trial motions. (*See* Dkts. 448, 449). This opinion addresses only Defendant Burke's motions.

evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (quoting *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014)); *see also United States v. White*, 95 F.4th 1073, 1078 (7th Cir. 2024); *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016) ("A defendant faces an uphill battle in challenging the sufficiency of the evidence."); *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (describing defendant's challenge as a "nearly insurmountable hurdle"). Further, courts "do not re-weigh the evidence or second-guess the jury's credibility determinations." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). "In short, if there is a reasonable basis in the record for the verdict, it must stand." *White*, 95 F.4th at 1078 (cleaned up).

### b. Waiver

The Government argues that since Burke only raised a sufficiency challenge to the Field Museum episode counts at the close of the Government's case, he waived his ability to raise further sufficiency arguments in his post-trial motions.[6] (Dkt. 461 at 4, 34–36).

On December 12, 2023, the Government rested its case in chief. (Dkt. 430 at 4088:15–16). Andrews then moved orally for a judgment of acquittal under Rule 29(a) "as to all elements of all counts." (*Id.* at 4089:14–18). Cui made the same oral motion for all counts in which he was charged (Counts 12, 13, 14, 15, and 17). (*Id.* at 4090:14–17). Burke, however, moved for acquittal "on charges relating to the Field Museum episode." (*Id.* at 4091:2–5). The Court took all three motions under advisement. (*Id.* at 4091:7) Burke's counsel then requested oral argument and filed a written motion, moving for acquittal under Rule 29(a) for counts relating to the Field Museum episode (Counts Eighteen, Nineteen, Racketeering Acts 5(a)–(b)). (Dkt. 378). They specifically argued that

---

[6] Specifically, the Government argues that Burke waived his challenges to the sufficiency of the evidence for Counts Two, Three, Four, Eleven, Fifteen, Sixteen, and Racketeering Acts 1, 2, and 4. (Dkt. 461 at 34–36).

no rational jury could find that Burke's statements constituted attempted extortion to obtain a position from the Field Museum. (Dkt. 432 at 4357–60). The Court again took the motion under advisement. (*Id.* at 4367). Defendant Andrews was the only defendant to orally renew his Rule 29 motion at the end of evidence. (Dkt. 439 at 4989). After the jury verdict, the Court set a 45-day deadline for post-trial briefs and directed the Government to respond to Burke's Rule 29(a) motion in that schedule. (Dkt. 442 at 5203–06).

Though appellate waiver or forfeiture[7] of sufficiency arguments has been heavily addressed in this Circuit, there is a dearth of analysis in the context of waiver between Federal Rule of Criminal Procedure 29(a) and (c) motions. The Court begins with the text of Rule 29. Rule 29(a) states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

Under Rule 29(c), a defendant may "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). Importantly, the "defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion." Fed. R. Crim. P. 29(c)(3). The language of Rule 29(c) explicitly allows a defendant to move for a judgment of acquittal in the first instance after a verdict. If the defendant already moved during trial under Rule 29(a), then their subsequent post-trial motion is presumably a "renew[al]" under Rule 29(c).

---

[7] *See United States v. Jacques*, 345 F.3d 960, 962 (7th Cir. 2003) (distinguishing waiver from forfeiture and noting while "waiver is accomplished by intent, forfeiture comes about through neglect" (quoting *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000))). Here, the Government is arguing purposeful waiver.

The crux of the issue here is whether a defendant who first moved under Rule 29(a) and then under Rule 29(c) waives all arguments he did not make in the Rule 29(a) motion. In other words, when Burke made a strategic decision to only bring a Rule 29(a) motion as to the Field Museum counts and did not raise a "general" challenge to the sufficiency of the evidence like his co-defendants, did he lock himself into those same arguments in his subsequent Rule 29(c) motion?

The Court does not believe this argument is frivolous or can be as easily dismissed as Burke argues. To begin, there is little case law distinguishing between Rule 29(a) and (c) motions. The Court sees two interpretations of Rule 29(c) at issue. First, that a Rule 29(c) motion is a renewal of, and thus limited by, the Rule 29(a) motion. A renewal is "the action of restoring or reestablishing." *Renewal*, Black's Law Dictionary (11th ed. 2019). This definition signals that a defendant could not expand outside of his previous Rule 29(a) motion when renewing it under Rule 29(c). Practically speaking, Burke was aware of any perceived evidentiary insufficiencies at the close of evidence and could have raised those challenges broadly, like his co-defendants. Yet, he chose to specifically target the Field Museum charges. The general principle is that if a defendant forgoes an opportunity strategically or knowingly, it is waived. *See Jacques*, 345 F.3d at 962; *United States v. Montgomery*, 379 F. App'x 527, 530 (6th Cir. 2010) ("The specification of grounds in the [Rule 29] motion is an indication that counsel has evaluated the record and has these particular reasons for his motion." (citing *United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993))).

The waiver position finds some support in the reverse: that a broad Rule 29(a) challenge protects the specific Rule 29(c) arguments made subsequently. *See United States v. Facteau*, 89 F.4th 1, 39 n.26 (1st Cir. 2023) ("Although appellants' Rule 29(c) motion specifically challenged [specific evidence], their Rule 29(a) motion asserted a general challenge to the sufficiency of the

Government's evidence on all counts. We consider this statement adequate to generally preserve the issue of sufficiency of the evidence.") (cleaned up)); *United States v. Hammoude*, 51 F.3d 288, 291 (D.C. Cir. 1995) (A "broadly stated" motion for acquittal "preserve[s] the full range of challenges, whether stated or unstated, to the sufficiency of the evidence.").

Otherwise, as Judge Oldham noted in his concurrence in the Fifth Circuit case of *United States v. Dubin*, Rule 29's concerns of notice and sandbagging arise. 27 F.4th 1021, 1034 (5th Cir.), *cert. granted*, 143 S. Ct. 416 (2022), *and vacated and remanded on other grounds*, 599 U.S. 110 (2023). If a defendant could "belatedly object[]" to new issues using untimely Rule 29 motions, a criminal could "argue one legal theory to the jury, lose on that theory [then] . . . argue a completely new theory after dismissal of the jury." *Id.* By that point, "the defendant has nothing to lose; the jury already convicted him. And he has everything to gain; if the court accepts his new legal argument, he's protected by the Double Jeopardy Clause." *Id.* The concerns of piecemeal litigation arise, and are validly present for the Government where, as here, Burke specifically challenged the sufficiency of the evidence for certain counts, then months later added five further counts and racketeering subparts.

The competing interpretation of Rule 29(c) gives the defendant an opportunity to bring a motion for a judgment of acquittal independent of their previous Rule 29(a) motion. The focus, then, is whether a defendant raised their challenges in *either* motion before appeal. This is possibly supported by the fact that courts usually lambast singular, deficient, Rule 29 motions when determining waiver, directing it at a defendant who does not renew her Rule 29(a) motion at all. *United States v. Wright*, 85 F.4th 851, 860 (7th Cir. 2023) ("While she made an oral motion for acquittal at the close of the government's case, she did not renew it at the close of evidence or through a timely post-trial motion."); *United States v. Nieto*, 29 F.4th 859, 867 (7th Cir.), *cert.*

*denied*, 143 S. Ct. 344 (2022); *see also United States v. Brisco*, 84 F. App'x 691, 694 (7th Cir. 2003) (finding defendant waived any sufficiency of the evidence challenge when defendant's Rule 29(a) was "confined" to six specific charges, thus "intentionally relinquish[ing] his right to challenge the evidentiary basis for" the conviction).

Ultimately, the defendant who moves for acquittal only once under Rule 29 on specific issues is limited in raising new arguments for acquittal on appeal. *See e.g.*, *United States v. Maez*, 960 F.3d 949, 959 (7th Cir. 2020) ("A motion under Rule 29 that makes specific arguments waives issues not presented[.]"); *United States v. Hamm*, 952 F.3d 728, 739 (6th Cir. 2020); *United States v. Maynard*, 984 F.3d 948, 961 (10th Cir. 2020). The lack of briefing by both parties on this issue makes it difficult for the Court to conclusively determine its impact on Burke's current motion. In *Dubin*, however, the district court addressed defendant's belated Rule 29 arguments, and the government did not raise an objection. 27 F.4th 1 at 1034–35; *see also United States v. Moya-Gomez*, 860 F.2d 706, 745 n.33 (7th Cir. 1988) (finding the "government . . . waived [defendant's Rule 29] waiver"). In contrast, here the Government does challenge Burke's ability to raise new arguments in his Rule 29(c) motion. It appears best practice for defendants to protect their full range of arguments by also making them under Rule 29(a). This would further help alleviate *Dubin*'s concerns of notice and sandbagging in post-trial motions. Due to the lack of guidance, however, the Court sees no reason to resolve the dispute now. Even if Burke's arguments were not waived, they still fail on the merits, as discussed below.

### c. Hobbs Act, 18 U.S.C. § 1951(a) — Count Eighteen and Racketeering Act 5(a) (Field Museum)

The jury convicted Burke in Count Eighteen with attempted extortion in violation of 18 U.S.C. § 1951(a) (the "Hobbs Act"). This count also constitutes the predicate act for Racketeering Act 5(a). To convict Burke with attempted extortion, the jury had to find that he (1) "knowingly

attempted to obtain money or property from the Field Museum"; (2) "attempted to do so by means of extortion by fear or under color of official right"; (3) "believed that the Field Museum would have parted with the money or property because of the extortion"; and (4) "the conduct of [Burke] affected, would have affected, or had the potential to affect interstate commerce." (Dkt. 384 at 301). Additionally, Burke had to "(1) knowingly take[] a substantial step toward committing extortion, (2) with the intent to commit extortion." (*Id.*) "The substantial step must be an act that strongly corroborates that the defendant intended to carry out the extortion." (*Id.*)

To begin, asking for favors is commonplace and not necessarily illegal. But it crosses the line into extortion if the victim is presented with an offer he can't refuse, with the specter of the official position hanging overhead—essentially, complete the favor or face consequences. The Government charged Burke with extortion because they believed he crossed that line, and the jury agreed. The facts of the Field Museum tell the story of an abuse of position of authority to gain money or property. While Burke attempts to downplay the criminality of his actions, the law supports the Government's theory. Under the stringent standard of viewing the evidence in the light most favorable to the Government and deferring to the jury's credibility determinations and rational inferences, the Court cannot find that the record is devoid of any evidence in which to find Burke guilty beyond a reasonable doubt on this count.

### i. Intent

Burke argues there was insufficient evidence that he knowingly attempted to obtain money or property from the Field Museum because his threat was not extortionate. Burke contends that: (1) he did not know there was a full-time job available for Gabinski at the time of the threat; (2) he told Lariviere that he did not want anything for Gabinski; (3) the Field Museum independently offered the full-time job; and (4) Gabinski was only offered a job interview. (*See generally* Dkt.

378; Dkt. 455 at 7). These arguments fail as a matter of law and are undercut by the evidence presented at trial.

First, whether Burke was aware of the full-time job is irrelevant. Burke had to act knowingly to extort money or property.[8] *See* 19 U.S.C. § 1951(a). "The evidence need not demonstrate that either a direct or indirect threat has been made, nor is it necessary to show that the official made a specific demand for payment on threat of a specific sanction." *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir. 1989) (first citing *United States v. Lisinski*, 728 F.2d 887, 889–91 (7th Cir.), *cert denied*, 469 U.S. 832 (1984); and then *United States v. Murphy*, 768 F.2d 1518, 1530 (7th Cir. 1985), *cert. denied*, 475 U.S. 1012 (1986) (cleaned up)); *Evans v. United States*, 504 U.S. 255, 260 (1992) (reasoning that under both common law and the Hobbs Act, "[a] demand, or request, by the public official was not an element of the offense."). Burke did not have to suggest the exact arrangement in express terms. *Evans*, 579 U.S. at 274 (reasoning an agreement must be explicit but not express, "for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.") (Kennedy, J., concurring); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (" 'Nudge, nudge, wink, wink, you know what I mean' can amount to extortion under the Hobbs Act[.]"). Nor was a meeting of the minds between the Field Museum and Burke necessary. *See United States v. Silver*, 948 F.3d 538, 550 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021); *see also Evans*, 579 U.S. at 266.

---

[8] The courts that have addressed "specific intent" under the Hobbs Act have not been receptive to such a requirement. *See, e.g.*, *United States v. Greer*, 640 F.3d 1011, 1018 (9th Cir. 2011) (declining to require a specific intent instruction in alignment with other circuits); *United States v. Carmichael*, 232 F.3d 510, 522 (6th Cir. 2000) ("To the extent [the defendant] is arguing that the district court was required to instruct the jury that, in order to convict [him], it had to conclude [he] intended to violate the Hobbs Act, we reject the argument as unsupported by the law."); *United States v. Arambasich*, 597 F.2d 609, 612 (7th Cir. 1979) (defining Hobbs Act intent as the intent " 'to obtain that which . . . ( he was) not entitled to receive' " or "with[] knowledge that the payments were the product of fear of economic harm").

Rather, a focus on the Field Museum's actions is only relevant to "whether [the bribe payor] would have reasonably believed, *at the time of the extortionate act*, that [the defendant] could deliver the power of his office for the victim's benefit." *Nedza*, 880 F.2d at 902 (emphasis in original); *United States v. Carter*, 530 F.3d 565, 574 (7th Cir. 2008) ("*De jure* ability to perform the promised act need not be present; sufficient is a reasonable belief that the state system so operated that the power in fact of the defendant's office included the effective authority to fulfill the promise.") (cleaned up). As outlined under the "fear or color of official right" element, *infra* p. 22, the jury could reasonably conclude that the Field Museum reasonably believed that Burke could use his office to harm their interests through opposing the fee increase. Going then to Burke's state of mind, Burke's statements that their proposal is "gonna go nowhere" if he called the Park District Board and that "somebody better fix it," clearly implied that Burke expected something be provided to remedy his displeasure before he helped the Field Museum. Whether that was a job for Gabinski, or a Van Gogh painting, the parties did not have to agree "so long as [Burke] intends it to be so and the [Field Museum] so interprets it." *Evans*, 579 U.S. at 274 (Kennedy, J., concurring).

Burke's remaining arguments are little more than an attack on the sufficiency of the evidence regarding his intent. At this stage, the Court respects the jury's inferences, if rational, and views the evidence in the light most favorable to the Government. Here, the jury could infer intent from conduct. *See United States v. Lewis*, 797 F.2d 358, 365 (7th Cir. 1986) (approving the use of indirect evidence to support that the defendant intended for the individual to part with property). Burke consistently tied the position to the museum's pending proposal. Though Burke told Lariviere the "ship has left the dock," his subsequent actions between September 8 and 11, 2017 painted a different picture. This same evidence supports that Burke took a "substantial step" toward

committing extortion. *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (defining "substantial step" as "some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime") (citation omitted). Between September 8 and 11, 2017—prior to the September 13, 2017 fee-increase vote—Burke engaged in calls with Bekken and Lariviere. He directed his staff to inquire about the paid position. He called Gabinski's mother to tell her about the paid position and noted that he received the offer after "read[ing] [the Field Museum] the riot act," for neglecting to respond to Gabinski's internship application. He also flouted his title and power over the fee-increase vote in his phone call with Bekken, establishing an inference that he was aware of his words' effect. Burke engaged in these steps with the goal of obtaining some benefit—which yielded the paid position—while the specter of the fee increase loomed above the Field Museum's head. A reasonable juror could infer that Burke took a "substantial step" toward committing extortion based on the evidence.

Burke's characterization of his words as just "angry and annoyed at the museum's perceived snub," (Dkt. 455 at 9), was presented to the jury at trial and the jury rejected it. (*See* Dkt. 196 at 162 (responding to Burke's identical argument by noting that he should "tell that to the jury")). The jury found that Burke's words could be perceived as a threat by the Field Museum and that he so intended. At this stage, the Court cannot take the same facts and make inferences in Burke's favor. Lastly, Burke raises that Gabinski was not ultimately given the job but an interview for the paid position. Yet, the extortioner need not accomplish the official act—here, obtaining the full-time position. *See Nedza*, 880 F.2d at 902 ("[T]he issue is not whether the extortionist is ultimately effective.").

In sum, the context of the various calls and emails held weight to the jury, and the Court will not re-weigh the evidence or second-guess the jury's credibility determinations in Burke's

favor now. *See Taylor*, 637 F.3d at 815–16. Those same words spoken by a layperson could possibly constitute blowing off steam. But spoken by the longest-serving alderman and Chairman of the Committee on Finance during a phone call seeking acquiescence for their pending fee increase—that he had previously opposed—means the implications and consequences are night and day. That is to say, a jury could reasonably conclude that Burke knew what he was doing and how his words affected Bekken and Lariviere, who ultimately kowtowed to Burke's threats.

### ii. Fear or Color of Official Right

The Indictment charged Burke with committing attempted extortion either by fear of economic harm, or under color of official right. Either prong violates § 1951(a). The evidence presented is sufficient for a reasonable juror to find Burke acted under either theory.

"[E]xtortion by wrongful use of fear of economic harm is established by showing that the defendant preyed upon or exploited the victim's fear of economic harm." *Nedza*, 880 F.2d at 902 (quoting *Lisinski*, 728 F.2d at 890); *United States v. Balzano*, 916 F.2d 1273, 1285 (7th Cir. 1990) (noting economic harm can be shown through both "threatening positive action" and "threatening to withhold official action" (quoting *United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir. 1989))). The public official must wield the powers of their office, "in such a way that it causes a victim to fear some form of retribution if payment of a demanded price is not forthcoming." *United States v. Stodola*, 953 F.2d 266, 271 (7th Cir. 1992) (quoting *Davis*, 890 F.2d at 1378). Yet, the "victim's fear must be reasonable." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 671 (7th Cir. 2005) (citing *Sutherland v. O'Malley*, 882 F.2d 1196, 1202 (7th Cir. 1989)).

Alternatively, a public official acts under "color of official right" when he "attempts to obtain money or property to which he is not entitled, believing that the money or property would be given to him in return for taking, withholding, or influencing official action." (*See* Dkt. 384 at

304); *see Balzano*, 916 F.2d at 1286–87. In order words, an official violates this prong, "when he encourages or accepts a payment knowing that it was prompted by the hope that the official will be influenced in the exercise of his or her powers." *United States v. Jenner*, 62 F.3d 1419, at *2 (7th Cir. 1995) (quoting *Davis*, 890 F.2d at 1378). Importantly, "[t]he use of office to obtain payments is the crux of the statutory requirement[.] . . . So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951." *United States v. Kuta*, 518 F.2d 947, 950 (7th Cir. 1975), *cert denied*, 421 U.S. 910 (1974) (quoting *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974), *cert. denied*, 95 S. Ct. 1562 (1975)); *see also United States v. Rindone*, 631 F.2d 491, 495 (7th Cir. 1980).

The evidence, viewed favorably to the Government, shows that Burke violated both prongs: he (1) exploited the Field Museum's fear of his interference in the fee increase proposal to demand a job for Gabinski (fear of economic harm) and (2) used his position as Chairman of Committee on Finance to attempt to obtain the job for Gabinski, believing that it would be in return for his lack of interference with the fee increase proposal (color of official right). First, the Field Museum believed that Burke had the power to block their fee increase proposal. (*See* Dkt. 400 at 452; Dkt. 401 at 615:25–16:15); *Nezda*, 880 F.2d at 902 ("A threat is not a state of mind in the threatener; it is an appearance to the victim." (quoting *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.), *vacated on other grounds*, 484 U.S. 807 (1987)). When Bekken attempted to meet with Burke to discuss the proposal, Burke immediately raised his displeasure over their treatment of Gabinski's application and his power to derail their proposal: "[I]f the Chairman of the Committee on Finance calls the President of the Park Board, your proposal's gonna go nowhere." He reminded her of his past inference and demanded that "somebody" fix it. Bekken testified that she perceived this to be a threat and went immediately to Lariviere. (Dkt. 400 at 465:3–9). After all, Bekken and

Lariviere knew that Burke had interfered with other fee increases in the past and wanted to be on his good side.

Thus, to circumvent a negative outcome for the pending proposal, the Field Museum executives scrambled to repair their relationship with Burke by offering a job interview to Gabinski. Viewing the whole Field Museum narrative, the jury could have rationally found that Burke's request to fix the situation was either "explicitly or impliedly linked to his continued support of [the Field Museum]." *Davis*, 890 F.2d at 1378 (finding sufficient evidence for "color of official right" where the jury was presented with evidence that defendant's "continued support [in City Council] was necessary to defeat the condemnation action," advancing the interests of those who offered him $3,000). It is thus impactful that Burke repeatedly tied the paid position to the fee increase while it was actively pending and directly in response to Bekken's initial outreach. With this context, the Field Museum's offer of the paid position opportunity could reasonably be construed as both a maneuver to avoid economic harm and "made to influence aldermanic power." *Kuta*, 518 F.2d at 950. Ultimately, Burke's words directly reference his position as the Chairman of the Committee on Finance and his knowledge of the weight his threats could carry.

### iii. Property

The Indictment alleges that Burke "attempted to obtain property, namely money and other employment compensation to be provided by [the Field Museum] to [Molly Gabinski]." (Dkt. 30 at 37; *see also* Dkt. 384 at 306 (" '[P]roperty' is money and other employment compensation to be provided by the Field Museum to Molly Gabinski."). The Government described the property as the paid position throughout the trial. (*See e.g.*, Dkt. 433 at 4419:24–4420:1; Dkt. 461 at 23–25). The jury was also instructed as such. (Dkt. 384 at 132).

24

Now, Burke argues that a "potential job interview" is not "property" under the Hobbs Act. This question of characterization is important. The Hobbs Act requires a victim to "part with" his property—it must "be transferable–that is, capable of passing from one person to another." *Sekhar v. United States*, 570 U.S. 729, 734 (2013). In *Sekhar*, the Supreme Court held that a defendant must "pursue something of value from the victim that can be exercised, transferred, or sold." 570 U.S. at 736. Accordingly, a general counsel's "yet-to-be-issued recommendation" approving of an investment was not "obtainable property" under the Hobbs Act. *Id.* at 737–38. The blackmailing that the defendant undertook to obtain the recommendation instead constituted coercion—which requires no obtaining of property—not extortion. *Id.* at 738. The First Circuit, in *United States v. Brissette*, further analyzed *Sekhar* and the legislative history of the Hobbs Act to determine that the exaction of wages for the benefit of third parties is "obtaining of property." 919 F.3d 670, 682 (1st Cir. 2019); *see also United States v. Enmons*, 410 U.S. 396, 400, 409 (1973).

Aligned with the above reasoning, the Court finds that Burke's attempted exaction of a paid position for Gabinski satisfies the "obtaining of property" element under the law. As the Court determined in pre-trial rulings, the "common-sense view" is that wages satisfy the definition of "property" under the Hobbs Act. *See* Dkt. 196 at 160–61). Wages have value and are transferable. *See Michalowski v. Rutherford*, 2016 WL 640433, at *4 n.8 (N.D. Ill. Feb. 18, 2016) ("[H]uman capital (labor) which arguably is 'something of value . . . that can be exercised, transferred, or sold.' " (quoting *Sekhar*, 570 U.S. at 736)); *see also United States v. Kirsch*, 903 F.3d 213, 227 (2d Cir. 2018) ("Wages and benefits are 'capable of passing from one person to another,'—in this case, from the employer to the employee—and are therefore 'transferable.' " (quoting *Sekhar*, 570 U.S. at 734)). Therefore, paying those wages requires the employee to "part with" the property. *Kirsch*, 903 F.3d at 227–28.

Even if the property was a potential job interview, the Court does not find it akin to the recommendation in *Sekhar*. Burke attempts to analogize that just as *Sekhar*'s "yet-to-be-issued recommendation" is not property because it is one step removed, neither is a yet-to-be-issued job. But the test in *Sekhar* asks whether property is transferable and obtainable, not whether it has been issued or is an intermediary. For that reason, the *Sekhar* Court found that a recommendation is never property. In contrast here, though a job interview was offered to Gabinski, it was reasonable, within the context of the entire Field Museum narrative, for the jury to infer that the job interview equaled the job, which meant wages. And, as discussed, wages are transferable and obtainable.

Further, Burke relies on *United States v. Blagojevich* for the proposition that a "job" is not "property" under the Hobbs Act. The Court finds the case distinguishable. In *Blagojevich*, the court analyzed whether an unpaid, appointed Cabinet position was "property" under the Hobbs Act. 794 F.3d 729, 735–36 (7th Cir. 2015). There, former Illinois Governor Rod Blagojevich proposed to President-elect Barack Obama that Blagojevich receive an appointment to Obama's Cabinet in exchange for appointing Obama's colleague to the Senate. *See id.* at 735–36. The court found that a "Cabinet job" was not "property" under the Hobbs Act because it was not transferable. Instead, a Cabinet position is a political office, akin to "state and municipal licenses." *Id.* at 735 (citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000)). "It is not owned by the person with appointing power, and it cannot be deeded over. The position may be filled by different people, but the position itself is not a transferrable property interest." *Id.* at 736.

Yet, the court signaled that the outcome could be different if Blagojevich asked Obama, "for a private sector job, or for funds that he could control," rather than a "swap of one official act for another." *Id.* at 734–35. The facts here bear more resemblance to the Seventh Circuit's hypothetical about public sector jobs than the actual circumstances in *Blagojevich*. Burke sought

a paid position with the Field Museum's public marketing team for his goddaughter. It was not a "public office" such as a Cabinet position to which Lariviere or Bekken had appointing power. Nor was this a proposed swap of political acts. And unlike *Blagojevich*, the position paid $47,500 per year. The jury instructions and evidence presented clearly supported a theory of Burke's swap of an official act for a private payment, namely a paid job for Gabinski. *Id.* at 734.

In addition, the "property" sought can be directed to a third party, here Gabinski. *See United States v. Green*, 350 U.S. 415, 420 (1956) (affirming defendant's conviction for extorting wages from employers to third parties since extortion "in no way depends upon having a direct benefit conferred on the person who obtains the property"); *Brissette*, 919 F.3d at 678 (holding that the "obtaining of property" element encompasses "circumstances in which the defendant is alleged to have directed the transfer of property to a third party"); *United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986) ("To secure a conviction under the Hobbs Act, the prosecution does not have to show that the defendant acted to receive, either directly or indirectly, the proceeds of his extortion or any benefit therefrom."). The Seventh Circuit has indirectly endorsed *Brissette*'s view. *White v. Sproul*, 2021 WL 3370851, at *2 (7th Cir. Apr. 9, 2021) (quoting *Brissette* and noting its holding is aligned "with the only other circuits to have resolved the same question"); *see also Wacker Drive Exec. Suites, LLC v. Jones Lang LaSalle Ams. (Ill.)*, 2019 WL 2270000, at *10 (N.D. Ill. May 28, 2019) (adopting *Brissette*'s analysis and finding an allegation that a company required plaintiffs to hire exclusively union labor satisfied the "obtaining of property" element). It is inconsequential whether the extorted wages are for a real or fictional position. *See Brissette*, 919 F.3d at 683–84.

In sum, the evidence presented supports a reasonable inference that after making an extortionate demand to the Field Museum, the property Burke then sought to obtain was

27

compensation through a paid position for Gabinski. Therefore, a reasonable jury could find that Burke was guilty under Count Eleven and Racketeering Act 5(a) of attempted extortion.

### d. 18 U.S.C. § 666(a)(1)(B) — Count Eleven (Pole Sign)

Count Eleven charged Burke with federal program bribery for corruptly accepting or agreeing to accept legal fees, intending to be influenced or rewarded in connection with some business of the City of Chicago involving $5,000 or more. (*See* Dkt. 30 at 49); 18 U.S.C. § 666(a)(1)(B). An act is "in connection with some business" of the City of Chicago—or an "official action"—if it is a "formal exercise of governmental power." (Dkt. 384 at 236). In other words, to convict under Count Eleven, the jury had to find beyond a reasonable doubt that Burke accepted or agreed to accept property tax appeal work from Cui in exchange for taking an official action related to the pole sign permit. (*See* Dkt. 384 at 233–36). Burke now challenges the sufficiency of the evidence that he took an official action. He argues that his two phone calls to CDOB Commissioner Judy Frydland and Zoning Administrator Patti Scudiero were not official acts under the Supreme Court's holding in *McDonnell v. United States*, 579 U.S. 550 (2016). In sum, the jury convicted Burke under a more stringent official act instruction than necessary under § 666 and the jury could reasonably infer his conduct encompassed the necessary corrupt intent.

### i. Official Action Discussion

The Court takes this opportunity to provide context to Burke's misleading reliance on *McDonnell* that underlies much of his remaining arguments. Throughout the proceedings, Burke repeatedly attempted to extend the "official action" instruction from the Supreme Court's ruling in *McDonnell* to § 666 and the Illinois bribery predicates.[9] In *McDonnell*, the Supreme Court defined the phrase "official act" under 18 U.S.C. § 201—a federal bribery statute in which Burke

---

[9] 18 U.S.C. § 666; 720 ILCS 5/33-1; 720 ILCS 5/33-3(a)(4); 720 ILCS 5/29A.

is *not* charged—to mean "a decision or action on a 'question, matter, cause, suit, proceeding or controversy,' " which must (1) "involve a formal exercise of governmental power"; and (2) "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 574 (quoting 18 U.S.C. § 201(a)(3)). In reaching this definition, the Supreme Court noted free speech, due process, and federalism concerns. *Id.* at 575–77.

The Court previously addressed *McDonnell*'s applicability to Burke's case. (*See, e.g.*, Dkt. 196 at 2, 18–22, 192–95; Dkt. 309 at 11–15). In denying on Burke's motion *in limine* seeking to exclude evidence on this basis, the Court acknowledged *McDonnell*'s concerns:

> First, without a clear definition, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *McDonnell*, 579 U.S. at 575. Second, relatedly, to comport with due process, "official act" must be sufficiently definite "that ordinary people can understand what conduct is prohibited" and to avoid "encourag[ing] arbitrary and discriminatory enforcement." *Id.* at 576 (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)). Third, considering federalism principles, the Court declined to read § 201 " 'in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.' " *Id.* at 576–77 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

(Dkt. 309 at 11–12). With these guiding principles in mind, the Court remained finely attuned to *McDonnell*'s implications, especially when crafting the jury instructions. *See Federal Corruption Statutes—Bribery—Definition of "Official Act"*—McDonnell v. United States, 130 HARV. L. REV. 467, 476 (2016) ("*McDonnell* may best be understood as revising jury instructions rather than rewriting what constitutes corruption itself.").

Neither § 666 nor the Illinois bribery statutes charged as predicates to the RICO and Travel Act counts contain the phrase "official act." For § 666 specifically, the Seventh Circuit Pattern Jury Instructions note that although "Section 666 does not use the term 'official act,' and instead uses 'any business, transaction, or series of transactions of such organization, government, or

29

agency' . . . lawyers and judges should consider the potential impact of *McDonnell* on § 666 cases." *Seventh Circuit Pattern Criminal Jury Instructions* § 666(a)(1)(B), Committee Comment (2023). In contrast, there is no indication that *McDonnell* applies to the state law bribery predicates.

Considering this guidance, the Court concluded that giving an "official action" instruction that circumscribed the relevant action for § 666 and the state law bribery predicates would protect Burke's due process and free speech concerns under *McDonnell*. The parties thus crafted an "official act instruction tailored to the relevant statute for each substantiative count to which it applies," tracking the official act in that statute. (*See* Dkt. 432 at 4324:19–20).[10] Thus, over the Government's objection, the Court gave a more stringent instruction than the text of the statutes called for, but declined to wholesale adopt *McDonnell* into its instructions.[11] (*See* Dkt. 309 at 12, 14) (noting the *quo* in § 666 is broader than § 201 and collecting cases). For § 666 and the state law bribery predicates, the Court instructed the jury that a public official engages in an "official action" if it is an "formal exercise of governmental power."[12] Further, the Court instructed that,

> [The government official] uses his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official.

[10] The jury instructions defined the following phrases describing the *quos* of the federal and state law bribery statutes: "in connection with some business, transaction, or series of transactions" (18 U.S.C. § 666, federal program bribery) (Dkt. 384 at 146); "an act or function of a public officer or public employee" (720 ILCS 5/33-1(e), bribery); an act "related to the employment or function of a public officer or public employee" (720 ILCS 5/33-1(d), bribery); an "act" in his "official capacity" (720 ILCS 5/33-3(a)(4), official misconduct); "conduct in relation to his employer's or principal's affairs" (720 ILCS 5/29A-1, A-2, commercial bribery); and, "official action" (18 U.S.C. § 1951(a), Hobbs Act). (Dkt. 384 at 39).

[11] *See United States v. Lindberg*, 39 F.4th 151, 173–75 & n.19 (4th Cir. 2022) (discussing the meaning of "business, transaction, or series of transaction" in § 666 in light of *McDonnell*, and approving a similar instruction—that "[s]etting up a meeting, hosting an event, talking to another official, sending a subordinate to a meeting, or simply expressing the [sic] support for a constituent"); *United States v. Robinson*, 663 F.3d 265, 273–74 (7th Cir. 2011) ("'Any' and 'anything' are terms of expansion. Although 'transaction' usually connotes a discrete act or event involving reciprocal exchange, the term 'business' has a broader meaning, at least in the context in which it is used here.").

[12] The Court gave the same official action instruction for all state and federal bribery charges except Counts Two and Eleven, which defined official action "'in connection with some business, transaction or series of transactions' if it is a formal exercise of governmental power *on behalf of the City of Chicago*." (Dkt. 384 at 236) (emphasis added).

> In addition, the government does not need to prove that the government official had the power to or did perform the act for which he was given or received something of value.
>
> However, a public official does not take official action if he does no more than set up a meeting, host an event, or call another public official.

(Dkt. 384 at 39, 146, 152, 160, 170, 184, 199, 213, 236, 242, 249, 261, 273, 285, 305, 316).

This language was taken in part from *McDonnell* and sought to strike a balance between *McDonnell*'s constitutional concerns and the federalism concerns that, in contrast to § 201, point towards retaining the relevant statutes' exact language. *See McDonnell*, 579 U.S. at 576 ("A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents.") (internal citation omitted)); *see also United States v. Lindberg*, 39 F.4th 151, 170 (4th Cir. 2022) ("18 U.S.C. § 666 does not raise the same federalism concerns as 18 U.S.C. § 201 because Congress 'clearly intended' § 666 to 'alter[] the existing balance of federal and state powers.'" (quoting *Salinas v. United States*, 522 U.S. 52, 59 (1997))); *United States v. Ng Lap Seng*, 934 F.3d 110, 138 (2d Cir. 2019) (reasoning that Congress "did not impermissibly intrude on a State's own policy choices when, in keeping watch on recipients of federal funding, it did not limit § 666 bribery to the 'official act' definition of § 201(a)(3)" (citing *Sabri v. United States*, 541 U.S. 600, 608 (2004))); *United States v. Ferriero*, 866 F.3d 107, 128 (3d Cir. 2017) (reasoning that federalism concerns were absent in rejecting a *McDonnell* challenge to a New Jersey bribery statute).

Now, in arguing that there was insufficient evidence for the jury to find he engaged in an official action under § 666, Burke attempts to import more language from *McDonnell* and its progeny as subtext to the instructions. Namely that the "official action" must be "something specific and focused," and "repeated" or "heavy" involvement in pushing another public official

to take an official action. (Dkt. 455 at 13 (first citing *McDonnell*, 579 U.S. at 2372; and then *United States v. Jefferson*, 289 F. Supp. 3d 717, 742–43 (E.D. Va. 2017)).

Ultimately, the jury convicted Burke under the Court's jury instructions that took *McDonnell* into account for § 666. Notably, the instruction arose from a compromise between the Government and Burke (over Government's continuing objection), and Burke did not object to the Court's tailored instruction.[13] To the jury, these instructions are the "law." Any after-the-fact attempts to stretch the instruction's additional specificity element beyond the intended scope and imbue it with further requirements from *McDonnell* are untimely and waived. Burke's arguments are not the elements of § 666 and the Court was clear that it found no reason to wholesale adopt *McDonnell*'s opinion into the § 666 instructions.

With this backdrop in mind, the Government presented two "official actions" Burke took related to the § 666 pole sign charge. First, contacting CDOB Commissioner Judy Frydland to assist with securing a pole sign permit. (*See* Dkt. 425 at 3509). Second, asking Zoning Administrator Patti Scudiero to review Cui's pole sign permit denial. (*See* Dkt. 427 at 3728).

### ii. Burke's Conduct Related to the Pole Sign Permit

Under § 666, the jury had to find that Burke corruptly accepted or agreed to accept legal fees from Cui, intending to be influenced or rewarded in connection with the pole sign permit. Burke first argues that he did not engage in official action under § 666's instructions since in his

---

[13] Specifically, the transcript reads:

> Burke's Counsel: And you would track whatever the equivalent of official act is in that statute, right?
> Government: Correct.
> Burke's Counsel: Okay. . . . We're in agreement with that, your Honor.
> Burke's Counsel: I think we've worked out an "official act" instruction which . . . gets at the heart of *McDonnell*.

(Dkt. 432 at 4312:17–18, 4324:21–4325:2).

calls to Frydland and Scudiero, he did not "exert pressure" on them but instead engaged in "routine" constituent services.

As outlined above, the jury had to find that Burke used his official position to exert pressure or advise Frydland and Scudiero to perform an official act. He had to do so "knowing or intending that the advice [would] form the basis" for their review of the pole sign permit. (Dkt. 384 at 236). There was sufficient evidence to support a finding that Burke, an alderman, contacted Scudiero and Frydland, CDOB officials, intending to advise them, or pressure them, to reevaluate a closed denial of a pole sign permit over which they had power. Here, Burke raised a specific matter—the denial of the pole sign permit. The jury was specifically instructed that Burke did not take official action if he did no more than "call another public official." (*Id.*) Thus, in contrast to the characterization Burke presented at trial, the jury found after considering this instruction that Burke's outreach to Frydland and Scudiero was in fact more than just a "call." Additionally, although Frydland and Scudiero did not testify that they felt "pressured" and did not reverse the permit denial, success is not an element of the crime: The jury need not find that Burke "had the power to or did perform the act for which for which he was given or received something of value." (*Id.* at 236); *United States v. Lee*, 919 F.3d 340, 352, 356 (6th Cir. 2019) (rejecting contention that an official can only "exert pressure" on a second official if the first official has "leverage or power" over the second official).

In fact, Burke's attempt to characterize his conduct as a "permissible constituent referral," is a thinly veiled challenge to the jury's findings of Burke's corrupt intent. *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015) ("[A]gents of a covered jurisdiction act corruptly if they know that the payor is trying to get them to do the acts forbidden by the statute, and they take the money anyway. That's a sensible definition of 'corruptly' . . . [and] a 'safeguard against

33

criminalizing innocent acts.' "); *United States v. Mitziga*, 2024 WL 383670, at *4 (N.D. Ill. Feb. 1, 2024) ("[A] person acts corruptly when he acts with the understanding that something of value is offered or given to influence or reward him in connection with his official duties."); *see also McDonnell*, 579 U.S. at 573 (connecting official action with intent).

Here, a reasonable juror could find beyond a reasonable doubt that Burke agreed to perform the outreaches to Scudiero and Frydland in exchange for the legal work from Cui. Viewed holistically, a reasonable jury could infer that Burke's actions were not taken out of the goodness of his heart. The pole sign was not in Burke's ward nor was Cui his constituent. Only after Cui offered him tax appeal work, did Burke try to reverse the permit denial. After receiving the promise of tax appeal work from Cui, Burke contacted Frydland to ask if "there was any way to help get this sign permit issued." Burke provided Cui's name and contact information so she could speak with him directly. When Frydland failed to issue the permit, Burke then asked Scudiero to resolve the problem. And when the longest-serving alderman and Chairman of the Committee on Finance asks a city official to "look into" a pending permit, the request is not taken lightly. The trial evidence supports the reasonable inference that Burke knew or intended his call to sway the permit evaluation in his favor. In fact, the jury was permitted to make the rational evaluation that Burke accepted the legal fees with the intent to assist Cui with his pole sign permit using his position as a powerful alderman. *See Morgan*, 635 F. App'x at 433 (finding a similar inference "rationally supported by the evidence."). Thus, Burke's argument that his calls constituted "routine constituent services," falls flat. Accordingly, the jury's conviction on Count Eleven stands.

### e. Travel Act, 18 U.S.C. § 1952(a)(3) and Remaining Count One Racketeering Acts, 18 U.S.C. § 1962(c)

Next, Burke moves for a judgment of acquittal regarding certain Travel Act convictions and their related Racketeering Acts. Specifically, he challenges Counts Three and Four (Post

Office), Fifteen and Sixteen (Pole Sign), and Nineteen (Field Museum). The Travel Act counts advance state law violations as the underlying unlawful activity. These counts also have nearly identical predicate acts charged in Count One.

The Travel Act criminalizes, in relevant part, the use of "the mail or any facility in interstate or foreign commerce, with intent to . . . otherwise promote, manage, establish, carry on, or facilitate . . . any unlawful activity." 18 U.S.C. § 1952(a)(3). The government need not prove the defendant violated the specified state law, only that the federal crime uses interstate facilities to further the unlawful activity. *United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000) (citing *United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991)). Accordingly, a conviction under the Travel Act "does not require that the state crime ever be completed." *Id.* Further, "unlawful activity" can include "bribery in violation of the laws of the state in which committed." *United States v. Isaacs*, 493 F.2d 1124, 1145 (7th Cir. 1974), *overruled on other grounds by McNally v. United States*, 438 U.S. 250, 359 (1987); (*see also* Dkt. 196 at 130–31). Burke's arguments again seek to graft *McDonnell* in its entirety onto the Illinois state law predicates. For the following reasons, they are unavailing.

### i. Counts Three and Four and Racketeering Acts 1(c) and (d) (Post Office)

Burke moves for a judgment of acquittal as to Counts Three and Four, and Racketeering Acts 1(c) and (d). These charges concern the Post Office episode, specifically actions Burke took in relation to Amtrak permits necessary to the Old Post Office redevelopment. The jury convicted Burke for corruptly soliciting legal work from 601W, intending to be influenced or rewarded when lobbying for specific approvals and funding for the Old Post Office project. Here, Burke argues that (1) his actions were not official acts but "typical communications to assist in cutting through

bureaucratic red tape"; and (2) Amtrak employees are not public officials. (*See* Dkt. 455 at 21–22; Dkt. 466 at 15).

For Counts Three and Four, the unlawful activities underpinning the Travel Act violations are: 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and 720 ILCS 5/33-1(e) (Bribery). The Court instructed the jury that to find Burke guilty under these predicates, Burke had to engage in an "act [in his] official capacity," 720 ILCS 5/33-3(a)(4) (Official Misconduct), "conduct in relation to his employer's or principal's affairs," 720 ILCS 5/29A-2 (Commercial Bribe Receiving), or "an act or function of a public officer or public employee," 720 ILCS 5/33-1(e) (Bribery). (*See* Dkt. 384 at 39). Relying on the June 19, 2017 and June 20, 2017 call and email, the jury found Burke committed the predicates of official misconduct and commercial bribe receiving, but not bribery. (GX 50, 254; Dkt. 30 at 40–41).

First, Burke's actions as to the Amtrak-related approvals constituted officials acts under the jury instructions for the state law predicates of official misconduct and commercial bribe receiving. *See* 720 ILCS 5/33-3(a)(4); 720 ILCS 5/29A-2. These statutes criminalize acts performed in a defendant's "official capacity" or "in relation to an employer's or principal's affairs." As explained above, *supra* p. 12, Burke's wholesale reliance on *McDonnell* for these predicates is misplaced. Under the jury instructions, Burke's meeting, email, and calls with Lang in his aldermanic capacity regarding pending Amtrak permit approvals constituted acts in his official capacity or in relation to the City of Chicago's affairs.

A reasonable juror could find that Burke's efforts on behalf of 601W, while lobbying for legal work behind the scenes, were not routine constituent services. The jury heard recordings from Burke's own mouth where he repeatedly expressed his desire to get 601W's legal work, such as "the cash register has not, uh, rung yet" and "did we land, the, uh, tuna?" This evidence led to the

36

reasonable inference that the interactions between Skydell, Burke, and Solis constituted a classic "you scratch my back and I'll scratch yours." The Court will not reweigh the jury's credibility determinations of Lang's testimony and the recordings among Skydell, Burke, and Solis. The jury heard ample evidence linking Burke's efforts to assist a project not located in his ward with obtaining legal work from 601W. Based on the evidence presented, a reasonable jury could find that Burke used his position to exert pressure on Lang, an Amtrak employee, to perform an official act, grant permits, with the knowledge or intention that his advice or pressure would form the basis for an official act, Lang's granting of permits. (*See* Dkt. 384 at 39).

Second, Burke's arguments regarding the status of Amtrak employees do not move the needle. It is clear that the jury was attuned to the issues surrounding Amtrak employees' unique employment status when they only convicted upon the state predicates that did not require Burke to influence an act related to the function of a "public officer" or "public employee." 720 ILCS 5/33-1(e). The Court instructed the jury that a public officer or public employee is one who is employed by the State of Illinois or one of its political subdivisions. (*See* Dkt. 384 at 41).

During deliberations, the jury asked if Amtrak employees were considered "public officers or public employees." (Dkt. 441 at 5186:6–9). After conferring with the parties, the Court told them "No." (*Id.* at 5188:12–14). Subsequently, the jury did not convict Burke in Counts Three, Four, or Racketeering Acts 1(c)–(d) with influencing an act related to the function of a "public officer" or "public employee." Accordingly, Burke's focus on that statute is irrelevant because the jury declined to find Burke guilty for the 720 ILCS 5/33-1(e) predicates that relied solely on Amtrak-related theories of action.

Finally, during trial the Court rejected Burke's argument that he must have jurisdictional authority over the Amtrak officials to violate the relevant state law predicates. The Court

concluded that there was no legal authority to support either limiting the exercise of government power to the jurisdiction where the public official sits or criminalizing the influence of only state or local officials. (*See* Dkt. 432 at 4323:1–3; *see also* Dkt. 311 at 5–7). Accordingly, a reasonable jury could find that Burke violated the law without possessing formal power over Amtrak employees such as Lang. As such, Racketeering Acts 1(c) and (d), which use the Travel Act violations as a predicate, also survive.

### ii. Counts Fifteen and Sixteen and Racketeering Acts 4(a)–(c) (Pole Sign)

To convict Burke for Travel Act violations under Counts Fifteen and Sixteen, the jury had to find at least one of the following unlawful activities for each count: 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 529A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving). (Dkt. 30 at 54–55; Dkt. 392 at 6, 11–12). Relying on the August 30, 2017 email and phone call to Cui regarding legal business, the jury found that, under both Counts Fifteen and Sixteen, Burke committed bribery (720 ILCS 5/33-1(d), (e)), official misconduct, and commercial bribe receiving. (Dkt. 392 at 6, 11–12).

Burke singularly argues that, for all counts related to the Pole Sign episode (Counts Eleven, Fifteen, Sixteen, Racketeering Acts 4(a)–(c)) there is insufficient proof that he took official action in exchange for property tax appeal work. (Dkt. 455 at 11). First, as already discussed, *supra* pp. 28–32, *McDonnell* does not wholesale apply to the jury instructions for the state law predicates. The Court also found that Burke engaged in official action under the jury instructions in relation to the Pole Sign episode. *See supra*, pp. 32–34. Even so, to violate 720 ILCS 5/33-1(d) Burke had to agree to accept property from Cui knowing that it was being tendered to him with the intent to cause him to "influence the performance of any act related to the employment or function of a public officer." (*See* Dkt. 384 at 121). The act, however, did not have to "ever be performed." (*Id.*)

The evidence presented, as outlined in Count Eleven, *supra* pp. 6–7, 32–34, was sufficient for the jury to reasonably find that Burke accepted the property appeal work with the knowledge that Cui retained him to get the pole sign permit. Additionally, the jury only needed to find one unlawful activity to convict under Counts Fifteen and Sixteen. Thus, the jury's convictions on Counts Fifteen, Sixteen, and Racketeering Act 4(a)–(c)—which share the same predicates—survive.

### iii.   Count Nineteen and Racketeering Act 5(b) (Field Museum)

Count Nineteen's Travel Act violation is predicated on the use of a facility of interstate commerce (here a telephone or email) to carry out Count Eighteen's attempted Hobbs Act violation. (Dkt. 30 at 59). Burke's September 12, 2017 call to Gabinski's mother discussing the paid job position is the factual basis underpinning this Travel Act violation.

Burke briefly argues that this call "in which Mr. Burke simply passed along the information," does not support Burke's extortionate intent. (Dkt. 455 at 10). Yet, as detailed above, *supra* pp. 18–22, there was sufficient evidence presented for a reasonable jury to infer one. The September 12, 2017 call was a piece of the larger effort by Burke to receive something from the Field Museum in exchange for his silence on their proposal. Moreover, the intent element of the Travel Act "applies to the purpose of the travel" and does not require a specific intent. *United States v. Markowski*, 772 F.2d 358, 365 (7th Cir. 1985); *see also United States v. Miller*, 379 F.2d 483, 486 (7th Cir. 1967) ("If Congress had intended to require specific intent with respect to the use of the interstate facility, the phrase 'with intent to' or its equivalent would have been juxtaposed to modify 'uses' in Section 1952(a)."). Thus, Burke had to intend that the call have the purpose of carrying out his effort to receive a paid position for Gabinski. The jury reasonably inferred from his words that Burke had the requisite unlawful intent to find him guilty on this count. Finally, the Government did not need to prove that Burke violated the Hobbs Act for the

jury to find him guilty under Count Nineteen. For these reasons, the conviction on Count Nineteen stands. Additionally, as the Court found sufficient evidence to sustain convictions on Counts Eighteen, Nineteen, and Racketeering Act 5(a), the jury's findings as to Racketeering Act 5(b)—which shares the same predicates—survives.

## II. Rule 33 New Trial Motion

### a. Legal Standard

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[C]ourts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). In other words, the Court should grant a motion for a new trial "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (quoting *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016)). Unlike a motion for acquittal, the Court need not view the evidence in the light most favorable to the government and it may consider the credibility of the witnesses. *See United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004). But granting a new trial is reserved "for only the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021).

### b. Count Two

The Court finds that the interests of justice do not weigh in favor of a new trial on Count Two. Count Two charges Burke with violating 18 U.S.C. § 666 when corruptly soliciting business for his law firm from 601W, intending to be influenced or rewarded when seeking the requisite approvals and funding for the Old Post Office redevelopment.

Burke raises numerous challenges to Count Two. Initially, Burke argues that the jury may have improperly evaluated Amtrak-related actions to find him guilty. The Government explained throughout its closing and rebuttal that the bases for Count Two were the actions seeking approvals from the Water Department, a Class L designation, and TIF funding—*not* the Amtrak-related conduct. (*See, e.g.*, Dkt. 434 at 4566:17–19; Dkt. 438 at 4954:23–55:9). The jury instructions reiterated this position.[14] (Dkt. 384 at 143); *see also United States v. Pierson*, 89 F.4th 976, 986 (7th Cir. 2024) ("We presume that the jury followed the court's instructions absent evidence of an overwhelming probability that the jury was unable to follow the instructions as given.") (citations omitted). The Court already found, *supra* pp. 35–38, that there was sufficient evidence for the jury to find Burke guilty under Amtrak-related evidence in Counts Three and Four. Here, the multiple reinforcements and the jury's attunement to the unique issues presented in the Amtrak-related actions convince the Court there was no reasonable possibility of prejudice to Burke that compels a new trial.

Next, Burke argues because the verdict form did not differentiate between the Class L, Water Department, and TIF actions, the jury's verdict may have been based solely on conduct involving what he believes is non-official Water Department action. (Dkt. 455 at 31–32; *see* Dkt. 392 at 8). First, this argument, consisting of one sentence, is skeletal and speculative. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments . . . are waived."). Nor did Burke object to the layout of the form for Count Two. (Dkt. 432 at 4343:14–15). In any event, for the reasons stated below, the Court does not find Burke

---

[14] The instructions stated that to find Burke guilty of corruptly soliciting and demanding things of value, the jury must in part find that he "acted with the intent to be influenced or rewarded in connection with some business, transaction, or series of transactions of the government; namely, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project." (Dkt. 384 at 143).

meets the demanding standard for a new trial based on the weight of the evidence. The jury could properly consider evidence relating to all three theories, belying the need for further differentiation.

Burke's arguments regarding the weakness of the evidence reprise his now-familiar Rule 29 challenges focused on *McDonnell*'s official action definition. Under a motion for a new trial, the Court may set aside the verdict if the evidence "preponderate[s] heavily against the verdict." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985)). But this is an exacting standard. In fact, motions for a new trial based on the weight of the evidence, "are not favored" and should be "grant[ed] . . . sparingly and with caution . . . only in those really exceptional cases." *Id.* (cleaned up). Here, Burke does not challenge the sufficiency of the evidence under Count Two, but argues it is both "exceedingly weak" as to the Class L designation and TIF theories, and discredited unofficial action under the Water Department theory.

First, to refresh, the jury instructions stated that Burke needed to "exert pressure on another official to perform an official act, or to advise another official" on an official action. (*See* Dkt. 384 at 146). For the Water Department, the jury heard evidence that Burke called former Commissioner Powers, who contacted then-Commissioner Murphy about the specific water service issues facing 601W. Murphy and Powers both understood the call from Burke was unusual, that there was "heat" from City Hall, and that Burke's powerful position made it so that he could inflict negative consequences if they were unresponsive to his requests. Further, the evidence showed that Burke was focused on receiving legal work from 601W and was increasingly frustrated when Skydell did not follow through on his promise to provide it. The jury could infer that Burke, using his official position, contacted Powers and Murphy as an attempt to exert pressure or advise on the water

service approvals for 601W, knowing or intending his call would form the basis of their decisions. The jury could also infer that Burke was doing so in exchange for legal business from 601W.

Further, Burke argues that the passing of the Class L designation and TIF funding was a "foregone conclusion." (Dkt. 455 at 32–33). Even so, a conviction under § 666 is not predicated upon the causation or success of the action. As noted above, *supra* page 33, § 666 does not require that Burke actually had the power to affect the outcome. Dkt. 384 at 146; *Lee*, 919 F.3d at 356; *Mitziga*, 2024 WL 383670, at *3 (rejecting a similar argument that proof of an actual loss is required). Like wire fraud, it is the scheme, not its success that is unlawful.[15] "Because bribery does not require the official to agree to or actually complete a corrupt exchange, neither does honest-services fraud by bribery," or "[i]n other words, though the offeror of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent." *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013); *see also Silver*, 948 F.3d at 549–50 ("Nothing [the defendant] points to suggests that the payor and recipient must share a common purpose"); *United States v. Burke*, 2022 WL 1970189, at *56 (N.D. Ill. June 6, 2022). Instead, the requisite analysis concerned Burke's intent. *Hawkins*, 777 F.3d at 882.

It is widely known that Burke's Committee on Finance controlled whether the Class L designation and TIF funding could be considered by the full City Council. (*See* Dkt. 399 at 234; Dkt. 408 at 1374–75). And Burke controlled the Committee's agenda, as he well understood when 601W stalled on giving him legal business: "good luck getting [the TIF] on the agenda." As Burke himself stated, since the "cash register has not rung yet," the jury could infer Burke would not be assisting 601W with the TIF proposal. Only after Burke's law firm received tax appeal business

---

[15] "The wire fraud statute punishes a scheme, not its success, . . . and the anti-bribery statute covers the solicitation of a bribe as well as it's receipt." *United States v. Lupton*, 2008 WL 647028, at *3 (E.D. Wis. Mar. 5, 2008) (first citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005); and then *United States v. Blitz*, 151 F.3d 1002, 1011 (9th Cir. 1998)).

from 601W for the Sullivan Center, did he agree to "absolutely" come through on the TIF proposal. (GX 141). And Burke shepherded both approvals out of the Committee on Finance and voted in their favor with the full City Council. The jury could reasonably find this constituted Burke's corrupt intent. Tellingly, Burke does not challenge this evidence as insufficient, nor is it "exceedingly weak."

Finally, Burke argues that in order to ensure the jury did not convict upon a gratuity theory, the Court should have explicitly instructed the jury that a *quid pro quo* was required. (*See* Dkt. 455 at 33–34). Burke raises the Supreme Court's pending decision in *Snyder v. United States*, which contemplates whether § 666 criminalizes gratuities—or payments in recognition of actions a local official has already taken or committed to take, without any *quid pro quo* agreement to take those actions.[16] (S. Ct., No. 23-108). In *Snyder*, the Seventh Circuit reaffirmed that there is no *quid pro quo* requirement under § 666. 71 F.4th 555, 579–80 (7th Cir.), *cert. granted*, 144 S. Ct. 536 (2023).

Most detrimental to Burke's argument, the Government did not pursue a gratuity theory on Count Two. (*See* Dkt. 455 at 33; Dkt. 432 at 4314:3–5). Even so, in accordance with the text of the statute and Seventh Circuit case law, the Court retained the language "intent to influence or reward" in the jury instructions. (*See* Dkt. 432 at 4314:8–16:21); *United States v. Johnson*, 874 F.3d 990, 1001 (7th Cir. 2017) (even though the word "reward" was included in § 666 jury instructions, "the challenged instruction did not criminalize gratuities" given the facts of the case); 18 U.S.C. § 666(a)(1)(B).

In *Johnson*, the Seventh Circuit shot down a similar argument to Burke's. 874 F.3d at 1001. First, the court noted that the word "reward" criminalizes bribes, as well as gratuities. *Id.* Thus,

---

[16] "A bribe requires a *quid pro quo*—an agreement to exchange this for that, to exchange money or something else of value for influence in the future." *Snyder*, 71 F.4th at 579. On the other hand, a gratuity is paid "as a reward for actions the payee has already taken or is already committed to take." *Id.* (citation omitted).

the district court's instruction including "influence or reward" was "clearly not erroneous under current law." *Id.* Second, the instruction made the defendant's conviction predicated upon his corrupt intent: "In other words, the jury instructions permitted conviction only if the jury found [defendant] had accepted bribes." *Id.* at 1001–02. Finally, the evidence presented at trial indicated the defendant's intent to be paid for his official acts before taking the action, consistent with bribes rather than gratuities. *Id.* at 1002.

Here, like *Johnson*, the Court was correct to include the language of "influence or reward" in its instructions. The jury had to find that Burke acted with a corrupt purpose in dealing with the Old Post Office developers, or in other words, had accepted bribes. (*See* Dkt. 384 at 143). Further, the evidence presented supports a bribery, not gratuity, theory: Burke agreed to help 601W based on Skydell's promises of legal business. The evidence, including recorded conversations with Burke, lends to the reasonable inference that 601W promised to give Burke's law firm legal work, which prompted Burke to vote in favor of the Class L designation and TIF funding and to help with the Water Department approvals. In other words, corrupt intent. Given the volume of evidence presented, Burke's speculation that the jury flouted the instructions and convicted on a gratuity theory is unfounded.[17]

### c. Count One

Burke briefly states that the Court should grant a new trial as to Racketeering Acts 1(a), (b) and 2(a), (b). (Dkt. 455 at 34). Burke notes that the Government pursued multiple, "undifferentiated" official action theories, which creates a "serious risk that the jury convicted on an official action theory that was not criminal." (*Id.*) For support, Burke cites *Yates v. Unites States*,

---

[17] Burke speculates that the jury convicted upon a gratuity theory, construing Klafter & Burke and 601W's August 2018 contingency fee agreements as a gratuity for his actions assisting with the Old Post Office redevelopment. (Dkt. 455 at 34).

for the proposition that a verdict must be "set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 9–10 (1978). *Yates*'s concern arises where "disjunctive theories of culpability are submitted to the jury" and the jury "returns a general verdict of guilty." *United States v. Viera*, 2022 WL 1468164, at *1 (2d Cir. May 10, 2022), *cert. denied*, 143 S. Ct. 388 (2022).

Burke's argument that there may have been insufficient proof for one of the official action theories sounds less like *Yates* and more in the register of *Griffin v. United States*, 502 U.S. 46 (1991). There, a jury was instructed on multiple possible bases for conviction which were all legally valid, but one basis was unsupported by sufficient factual evidence. As the Seventh Circuit distinguished, under *Griffin*:

> The jury is told correctly that the law forbids the doing of either A or B, and the record permits a rational trier of fact to find that the defendant did A, but it does not permit a conclusion that he did B. In these cases, *Griffin* holds, the verdict is sound. A reviewing court should assume that the jury found that the defendant committed the act that the facts support; anything else would attribute irrationality to the jury. Juries apply to the facts of the case the law articulated by the judge.

*Tenner v. Gilmore*, 184 F.3d 608, 611 (7th Cir. 1999).

Here, the jury was instructed they could base their findings for Racketeering Acts 1(a) and (b) on Burke's actions in any of the following theories: Water Department approvals, a Class L designation, Amtrak approvals, or TIF funding. But the verdict is valid for these Racketeering Acts so long as the jury finds sufficient evidence that the predicate offenses were committed for just one of the listed theories. And for the reasons already stated, the Court found there was sufficient evidence to sustain the jury's convictions on all theories of official action. Further, the jury found Burke committed Racketeering Act 2, which related solely to the TIF funding, and Counts Three

and Four, which related only to Amtrak, signaling they found sufficient evidence as to those two theories independently.

Lastly, in a one sentence analysis, Burke states that the Government's inclusion of the TIF official action theory in Racketeering Acts 1 and 2 signals that the acts were not sufficiently "separate" to constitute separate acts under RICO. (Dkt. 455 at 35). First, cursory arguments are rejected. *See Berkowitz*, 927 F.2d at 1384. The Court instructed the jury that to find that Burke committed a "pattern of racketeering activity," they must find beyond a reasonable doubt that Burke (1) committed at least two racketing acts, (2) "those acts were in some way related to each other," (3) "there was continuity between them," and (4) "they were separate acts." (Dkt. 384 at 36). Burke raises, without authority, that the Post Office episode cannot be the basis for two Racketeering Acts that charge distinct predicate crimes. In any event, Racketeering Acts 1 and 2 encompass distinct timeframes and actions in 2017 and 2018. (Dkt. 30 at 29–32). Finally, as the Government notes, Burke does not contest the jury's findings on Racketeering Act 3. Thus, the jury's verdict could stand upon the jury's findings as to Racketeering Acts 1(c)–(d), 3, 4, and 5. In sum, Burke's contention does not amount to any reasonable possibility of error of a prejudicial effect on his verdict.

## CONCLUSION

For the reasons explained above, the Court denies Burke's Motion for Judgment of Acquittal and for a New Trial [378] [455].

Virginia M.  Kendall
United States District Judge

Date: June 21, 2024

47