UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES CUI | No.   19 CR 322-3<br><br>Hon. Virginia M. Kendall |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby submits this sentencing memorandum concerning defendant Charles Cui. The government respectfully represents as follows:

## PRELIMINARY STATEMENT

Defendant Charles Cui, a sophisticated attorney and property developer, bribed Chicago's most powerful Alderman, Edward M. Burke ("Burke"), in an effort to obtain a City of Chicago pole sign permit that was worth hundreds of thousands of dollars to Cui. Rather than pursue lawful means to acquire the permit, Cui cynically leveraged Burke's willingness to engage in corruption in an effort to procure a City permit that he had no lawful ability to obtain. Notably, unlike the other episodes of Burke's corrupt activity, it was Cui—not Burke—who initiated the pole sign bribery episode for which Cui and Burke were both convicted.

Cui's criminality did not stop there. In particular, when later questioned by the FBI about the incident, Cui brazenly lied in a desperate effort to avoid responsibility for his serious criminal conduct. Later, Cui intentionally withheld and

concealed from the grand jury two incriminating email communications that were directly responsive to a grand jury subpoena served upon Cui.

The jury convicted Cui on all counts against him. Cui asserted his factual innocence at trial and has never expressed remorse for his criminal activity. Given that fact, as well as the seriousness of Cui's crimes, the need to promote respect for the law and provide just punishment, and the strong need to deter others from engaging in similar crimes, a sentence of imprisonment at the low end of the applicable Guideline range is reasonable, just, and warranted.

## I.    FACTUAL BACKGROUND AND OFFENSE CONDUCT

By virtue of presiding over the trial and the extensive pre-trial and post-trial motion practice, as well as review of the presentence investigation report ("PSR"), this Court is familiar with the facts of Cui's criminal bribery of Burke in pursuit of the pole sign permit. Set out below is a truncated summary of Cui's criminal conduct for the sake of convenience and to highlight relevant sentencing factors.

### Background

Cui was the sole member and manager of Irving Park Property Holdings, LLC ("IPPH"), which was redeveloping nine parcels of commercial property located along the south side of West Irving Park Road in Chicago, including property at 4901 West Irving Park Road. The property was on the northwest side of Chicago and was not in Burke's ward, which was located on the southwest side of the City.

In 2016, Cui entered into a Redevelopment Agreement with the City of Chicago. The Redevelopment Agreement (GX414) provided that up to $2,000,000 of Cui's redevelopment project would be financed through tax increment financing

2

("TIF") funds, but further provided that IPPH had to complete the redevelopment project by September 30, 2017, and that TIF funds would not be distributed until completion. The Redevelopment Agreement also required that IPPH lease the property at 4901 West Irving Park Road (consisting of approximately 24,481 square feet of space) to Gold Standard Enterprises, Inc., d/b/a "Binny's Beverage Depot," a retail liquor and beer distributor. Cui leased that space to Binny's pursuant to a written lease. The base lease period was 15 years, with the option to renew the lease for up to seven five-year extensions, for a total potential lease term of 50 years. The lease also provided that Binny's would have the exclusive right to a 30' tall metal pole sign located at the corner of Irving Park Road and Lamon Avenue.

The last permit allowing use of the pole sign expired in 2012. In April 2017, Binny's applied to the Chicago Department of Buildings ("CDOB") for a permit to use the pole sign. CDOB rejected the permit application after the Bureau of Zoning denied the zoning approval because it was located in an area where, as a result of a zoning change, freestanding signs were no longer allowed to be used.

In July 2017, as a result of CDOB's denial of the permit application, Cui and Binny's entered into a letter amendment to the lease agreement (GX424), pursuant to which Binny's received a rent reduction of $0.50 per square foot off the base rent if, by October 31, 2017, IPPH did not secure permission from the City of Chicago to use the pole sign. The rent reduction was worth approximately $183,607 over the 15-year base period, and approximately $612,025 over the entire 50-year lease period.

*Cui Bribes Burke by Offering Business to Burke's Law Firm*

On August 23, 2017, Cui left a voicemail for Burke, and told Burke he needed help on a legal matter, followed, less than 30 minutes later, with an email to Burke's personal email address in which Cui asked Burke whether he would be willing to represent Cui with respect to the pole sign permit denial. GX270. Notably, Cui expressed to Burke his concern that failure to obtain the pole sign permit might cause Binny's to "cancel the lease" or to "ask for [a] significant rent reduction." In fact, if Binny's cancelled the lease, IPPH would be in breach of the Redevelopment Agreement and no portion of the TIF funds would disburse.

On August 24, 2017, having received no response from Burke, Cui elected to bribe Burke by offering tax appeal work for the Irving Park Road redevelopment project to Burke's law firm, Klafter & Burke, in exchange for Burke's effort to procure the pole sign permit. Cui's intent to knowingly engage in bribery was clear from three emails he transmitted that day. First, Cui forwarded an email to Ray Chin, a friend who had introduced Cui to Burke, reflecting Cui's attempt to reach Burke from the day before and informing Chin that he planned to offer Burke property tax appeal work for the entire redevelopment project:

> fyl.
> I threw your name there.
>
> Maybe he thinks there is conflict of interest, because of his position. I'll ask him to represent me for property tax appeal, which will be a big bite, comparing with this.

GX271. The "big bite" Cui referenced was the potentially lucrative fee to Burke's law firm from a successful tax appeal. Second, a few minutes later, Cui emailed his long-

standing property tax attorney, George Reveliotis, and apologetically informed Reveliotis that he needed to shift the property tax appeal work for the Irving Park Road redevelopment project from Reveliotis to Burke's law firm for one year, in order to enlist Burke's help with zoning and receipt of TIF funds:

> On Aug 24, 2017, at 12:03 PM, Charles Cui <charlescui111@yahoo.com> wrote:
>
> George,
>
> Can I ask you for a favor? Can I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least for this year? I have TIF deal going with the City, and he is the Chairman of Finance Committee. He handled his tax appeal business card to me, and I need his favor for my  tif money. In addition, I need his help for my zoning etc for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year.
>
> Make sure to appeal 600 E. North Ave, Carol Stream; 1560 S. Ridge Road, Lake Forest, IL; Grayslake vacant land; 1320 Waukegan Rd, Glenview, IL.
>
> Thanks!
>
> Charles

GX272.

Third, less than 15 minutes after emailing Reveliotis, Cui emailed Burke and offered him property tax appeal work for the entire Irving Park Road redevelopment project. GX273.

On August 30, 2017, at Burke's direction, a member of his law firm, Kelly Keeling, contacted Cui, who then promptly provided Keeling with information she requested about the Irving Park Road redevelopment project. GX277.

On August 31, 2017, Burke personally asked the Building Commissioner, Judy Frydland, to look into the pole sign permit denial to see if there was any way to reverse the decision. The same day,  at Burke's direction, Burke's City Hall assistant notified Cui that Frydland would be contacting Cui about the pole sign.

Following the Labor Day weekend, on Tuesday, September 5, 2017, Cui entered into a contingency fee arrangement with Klafter & Burke for property tax appeal work for the Irving Park Road redevelopment project. GX427. That agreement provided that Burke's firm would receive up to 30 percent of any tax savings if it successfully challenged real estate taxes assessed upon the nine parcels of property that made up the Irving Park Road redevelopment project (and that fee could increase to 33 percent of tax savings under certain conditions). *Id.* Cui believed the value of this legal work to be significant. *See* GX271 (in email to Chin, above, Cui described the tax work as a "big bite" for Burke's law firm).

### *Cui Submits a Doctored Photo to CDOB*

Meanwhile, Cui, working through his zoning attorney, Tom Moore, was attempting to persuade the CDOB to reverse its denial of the permit application. On September 7, 2017, in order to supply Frydland with a plausible basis to justify the reversal of CDOB's decision, Cui transmitted a doctored image of the pole sign ostensibly showing that it was being used by Cui to advertise for tenants. However, a CDOB employee, then-Deputy Commissioner Matthew Beaudet, who was personally familiar with the pole sign and the area, identified the image as doctored.

Later on September 7, 2017, Moore informed Cui that Beaudet had confirmed that the pole sign could not be "grandfathered" for use given the zoning designation. GX283. Approximately 13 minutes later, Cui forwarded the email chain transmitting

the doctored image to Burke's personal email account, noting that "First Deputy Commissioner Matt Beaudet has issue with this." GX279.[1]

On September 8, 2017, Cui emailed Frydland (not copying Moore or Beaudet) and claimed that he received the doctored image from his "broker," who was willing to "testify" about the image. GX286. However, Cui neither identified the broker nor otherwise disclaimed that the image was altered, even though he had personal knowledge of the sign's use (and lack thereof). In fact, Cui's office was located at 4901 W. Irving Park Road, and the FBI subsequently interviewed him at that location. Rather, Cui asserted that Binny's might cancel its lease if the pole sign was not permitted and, therefore, that the economic development of the neighborhood would be enhanced by the permitting of the pole sign.

After Beaudet determined the pole sign photograph was fake, CDOB took no further steps regarding the pole sign.

Unwilling to drop the issue despite having been caught perpetrating a fraud on the CDOB, Cui shifted his effort toward the Alderman for the ward in which the pole sign was located, namely, 45th Ward Alderman John Arena. In an email on September 13, 2017, Cui told Arena that failure to allow Binny's to use the pole sign would cost him $750,000 over the lease period and would jeopardize his ability to finish the project. GX304. In the same email, Cui mentioned that he had not informed his lender about the pole sign permit issue due to fear that there might be a "significant consequence" should the lender learn of the situation. *Id.* Cui also

---

[1] The copy of this email introduced at trial did not include the doctored image.

forwarded that email to Chin, asking whether Burke was close to Alderman Arena and, if so, whether Burke might be able to intercede with Arena "about this pole sign issue." *Id.*

The pole sign was never permitted for use by Binny's and, in or around the Fall of 2017, Cui caused the pole sign to be removed. Cui and Binny's then entered into a settlement agreement whereby the rent reduction terms of the July 2017 letter amendment were replaced with the granting of a one-time credit of $60,000.

### Cui Lies to the FBI During a 2018 Interview

On November 29, 2018, two FBI agents conducted a recorded interview of Cui at his office . During the interview, Cui made multiple false statements regarding his interaction with Burke in relation to the pole sign. In particular, Cui lied by claiming he did not offer business to Burke around the time he was seeking Burke's help with the pole sign matter:

```
1204   CHOI:        Okay. Did you, did you ever, um, offer to, um, offer
1205                him business again after? I know you had said—
1206
1207   CUI:         No.
1208
1209   CHOI:        —he had represented you before, but did you ever offer
1210                business to him again, right around the time when you
1211                were seeking help about the pole sign issue?
1212
1213   CUI:         No.
```

GX145; *see id.* at lines 1250-53 (Cui reiterated that he did not offer Burke business around the time of the pole sign matter). In an earlier part of the interview, Cui had falsely asserted that he had hired Klafter & Burke for tax appeal work well in advance of the pole sign issue. GX145 at lines 1030-38 (Cui claimed that he hired Klafter & Burke in "2016," which he then revised to "2017, 2016").

In a further effort to falsely decouple the bribe (Cui's offer of tax appeal work) from the official action (Burke's help with the pole sign permit), Cui lied by claiming he hired Burke's firm only because he believed Burke to be a good tax appeal attorney:

```
1355   CHOI:          But you don't recall ever offering Mr. Burke business
1356                  during the time when you're trying to resolve the pole
1357                  sign issue?
1358
1359   CUI:           No, I offered Mr. Burke business a while ago, just
1360                  because he's a good tax appeal lawyer.
```

GX145; *see id.* at lines 1402-12, 1741-1750. As Cui's email to Reveliotis reveals, Cui's statement to the FBI was demonstrably false. Cui only reluctantly moved the tax appeal work for the Irving Park Road redevelopment project from Reveliotis to Klafter & Burke because he needed Burke's clout to try to ensure that the pole sign permit would be issued, thereby preserving Cui's full rent payments and enhancing Cui's likelihood of satisfying the strict requirements of the Redevelopment Agreement necessary for Cui to receive the TIF payments. Cui's limited engagement of Klafter & Burke in return for Burke's effort to secure the pole sign permit is further underscored by the fact that Cui moved the tax appeal work for the Irving Park Road redevelopment project back to Reveliotis the following year.

Finally, Cui lied by repeatedly claiming that the information Cui provided to the agents was accurate to best of his knowledge. GX145 (pp. 35-36).

### *Cui Obstructs the Government's Grand Jury Investigation*

At the end of their interview on November 29, 2018, FBI agents served Cui with a grand jury subpoena seeking records concerning the government's investigation. The subpoena clearly required that Cui provide any relevant email messages. Thereafter, Cui, through his attorney, produced records in response to the

grand jury subpoena, but intentionally refrained from including in the response two incriminating email messages (which, unbeknownst to Cui, the government previously procured through the execution of a search warrant on Cui's email account earlier in 2018). The two emails consisted of those that Cui transmitted separately to Ray Chin (GX271) and George Reveliotis (GX272) on August 24, 2017, in which Cui laid bare his illicit motive for hiring Burke's law firm to do tax appeal work. Cui intentionally withheld these emails from the grand jury subpoena production because they both are highly probative of Cui's intent to bribe Burke as a means to reverse the pole sign permit denial.

Cui's withholding of these two emails was particularly obstructive because Cui also affirmatively asserted to the government that he was waiving all attorney-client privilege that might apply to his emails. Such a broad waiver of privilege, which is designed to demonstrate a desire to be fully forthcoming, implies that no other emails responsive to the subpoena exist. If believed, such a waiver would naturally lead the government to conclude (incorrectly) that Cui was being fully transparent and that the government possessed the entire universe of responsive materials. Thus, far from being an effort at transparency, Cui's so-called "waiver" was actually yet another smokescreen designed to prevent the government from fully and thoroughly investigating Cui's bribe scheme.

## II.     GUIDELINES CALCULATION AND OBJECTIONS TO THE PSR

The jury convicted Cui on all five counts against him: Count 12, federal program bribery, in violation of 18 U.S.C. § 666; Counts 13-15, Travel Act offenses, in violation of 18 U.S.C. § 1952(a)(3); and Count 17, making false statements, in violation of 18 U.S.C. § 1001(a).

### A.     Offense Level Calculations

The Probation Office and parties agree on the Guideline sections to be applied in this case. There is disagreement with respect to the calculation of the value of the bribe's benefit under Guideline § 2C1.1(b)(2), as well as the applicability of the obstruction enhancement under Guideline § 3C1.1.

#### 1.     Grouping

The PSR concludes that the bribery count and the Travel Act counts group pursuant to Guideline § 3D1.2(d). PSR ¶¶ 39-43. The government concurs and further notes that grouping would also be appropriate under Guideline § 3D1.2(b).

The PSR also concludes that the false statement count (Count 17) should be grouped with the other four counts pursuant to Guideline § 3D1.2(d). PSR ¶ 43. The government concurs. Thus, all five counts of conviction form a single group.

#### 2.     Guidelines Application

Count 12, which cross-references to Guideline § 2C1.1, drives the offense level calculation for the single group of all five counts. This is because the Travel Act counts (Counts 13, 14, 15) cross-reference to Guideline § 2E1.2(a)(2), which sets the base offense level for those counts at "the offense level applicable to the underlying . . . unlawful activity in respect to which the travel or transportation was undertaken,"

thereby making the total offense level for each of the Travel Act counts identical to the offense level for the bribery count (Count 12). The total offense level for the false statement count (Count 17) will be 6, pursuant to Guideline § 2B1.1(a)(2).

### a.    Base Offense Level

The PSR calculated the base offense level to be 12, pursuant to Guideline § 2C1.1(a)(2). The government concurs.

### b.    Value of Benefit to be Received (Loss)

The PSR calculated that a 10-level enhancement was appropriate under Guideline § 2C1.1(b)(2), which provides as follows:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

PSR ¶¶ 46-50. With reference to the fraud loss table at § 2B1.1(b)(1), the PSR determined that the value of the benefit from the bribery—here, the amount of the lost rent that Cui sought to avoid by bribing Burke—is conservatively calculated as $183,607, which represents the lost rents over the original 15-year base term of the lease between IPPH and Binny's as a result of Cui's failure to procure a permit for the pole sign. This results in a 10-level increase pursuant to § 2B1.1(b)(1)(F).

The government respectfully disagrees and, for the reasons set forth in the government's version of the offense, believes that the benefit of the bribe is properly calculated to be $612,025 (the lost rent over the entire 50-year period of the lease),

which would result in a 14-level increase under § 2B1.1(b)(1)(H). However, with that argument preserved for the record, the government acknowledges that, during Burke's sentencing hearing, this Court rejected the government's position and calculated the benefit of the bribe for the pole sign episode to be $129,527.07, which represents the loss calculation by Burke's expert witness for the base 15-year term of the lease. Therefore, assuming that the Court will make the same finding with respect to defendant Cui, the value of the benefit of the bribe results in an 8-level increase pursuant to § 2B1.1(b)(1)(E).

With respect to this "loss" calculation, Cui adopts and reiterates the arguments made by Burke at his sentencing, namely, that the loss amount should be zero or, failing that, should be $60,000, which represents the amount of rent reduction ultimately agreed to by Cui and Binny's. This Court should reject those arguments for the same reason it rejected those arguments when made by Burke and, in a consistent manner, conclude that the value of the benefit of the bribe is $129,527.07.[2]

### c.    Elected Official Enhancement

The PSR applied a four-level increase pursuant to Guideline § 2C1.1(b)(3) because Burke was an elected official. The government concurs.

### d.    Obstruction Enhancement

The PSR applied a two-level increase pursuant to Guideline § 3C1.1 based upon Cui's intentional withholding, in response to a grand jury subpoena, of the

---

[2] As noted above, the government respectfully preserves its objection to the Court's loss calculation, notwithstanding its position that the loss amount for the pole sign episode should be identical for Burke and Cui.

emails that Cui transmitted to Chin and Reveliotis on August 24, 2017, within which Cui made clear his intent to bribe Burke. The government concurs. These emails were plainly responsive to the grand jury subpoena and highly incriminating, particularly Cui's email to Reveliotis. As discussed above, Cui's withholding of the emails, especially after deceptively asserting that he was waiving all privilege with respect to his emails, was a calculated move designed to conceal crucial evidence from the government while attempting to appear transparent and cooperative.

Under Guideline § 3C1.1, the two-level enhancement applies when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation . . . of the offense of conviction, and the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." A non-exhaustive list of examples of such conduct are set forth in Application Note 4 to the guideline. Cui's conduct is covered by Application Note 4(d) to § 3C1.1, which lists an example including "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . ."

In this case, the two email communications that Cui concealed were (A) directly responsive to the grand jury subpoena served upon Cui by the FBI agents; and (B) material to the investigation in that they were highly probative of Cui's intent to bribe Burke with property tax appeal business in order to obtain Burke's assistance

14

in reversing the pole sign permit denial. Accordingly, the enhancement is warranted. *See United States v. Powell*, 576 F.3d 482, 498 (7th Cir. 2009) (obstruction enhancement warranted where defendant failed to produce records in response to a grand jury subpoena by both failing to inform records custodian about the subpoena and, separately, by falsely claiming the records were lost in a "computer crash"); *United States v. Lange*, 312 F.3d 263, 270-71 (7th Cir. 2002) (failing to turn over stolen data as required by grand jury subpoena and feigning compliance with the subpoena warranted the enhancement); *United States v. Zizzo*, 120 F.3d 1338, 1362 (7th Cir. 1997) (enhancement warranted based upon selective culling of responsive financial records from those provided in response to a grand jury subpoena); *United States v. Austin*, 54 F.3d 394, 403-04 (7th Cir. 1995) (in counterfeit art case, failure to provide sales records required by grand jury subpoena justified enhancement: "Austin's failure to turn records of the Hanson sales over to the grand jury despite a subpoena also constitutes obstruction."); *see also United States v. Monem*, 104 F.3d 905, 909 (7th Cir. 1997) (enhancement justified by defendant's failure to appear before a grand jury and his act of preventing his spouse from doing likewise) (citing *Austin*); *United States v. Briscoe*, 65 F.3d 576, 592 (7th Cir. 1995) (enhancement applied to destruction of records after being served with a grand jury subpoena for those records).

### e. Zero-Point Offender

The PSR applied a two-level reduction pursuant to Guideline § 4C1.1(a), and the government concurs.

### f. Offense Level Calculation Summary

Based upon the foregoing, and to ensure consistency with this Court's findings during the Burke sentencing, Cui's final offense level is 24, as follows:

| Guideline | Description | Adjustment |
|---|---|---|
| § 2C1.1(a)(2) | Base Offense Level | 12 |
| §§ 2C1.1(b)(2), 2B1.1(b)(1)(E) | Value of the Benefit of the Bribe | +8 |
| § 2C1.1(b)(3) | Elected Official | +4 |
| § 3C1.1 | Obstruction of Justice | +2 |
| § 4C1.1 | Zero-Point Offender | -2 |
| | TOTAL: | 24 |

### B. Criminal History Category

The government agrees that Cui has no criminal history points and, therefore, is in criminal history category I. PSR ¶¶ 66-67.

### C. Advisory Guideline Range

With a final offense level of 24 and a criminal history category of I, Cui's advisory guideline range is 51 to 63 months' imprisonment.

The Probation Office concluded that the total offense level was 26, which yielded an advisory guideline range of 63-78 months' imprisonment. PSR ¶ 122. The

difference arises from the PSR determination that the benefit of the bribe exceeded $150,000. *Cf.* Loss Table at Guideline § 2B1.1(b)(1)(E) (more than $95,000) and (F) (more than $150,000).

## III. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(E)

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the sentence to impose, after calculating the Sentencing Guidelines, the court must consider the statutory factors listed in § 3553(a)(1)-(7). *Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").

For the reasons set forth below, full consideration of the statutory sentencing factors set forth at 18 U.S.C. § 3553(a) suggests that a sentence at the low end of the Guideline range is reasonable and appropriate in this case.

### A. The Nature and Circumstances of the Offense, and the Need for the Sentence to Reflect the Seriousness of the Offense

Motivated by sheer greed, Cui attempted to use corruption of an elected official as a tool to line his pockets with money. The fact that Burke was more than willing to accept Cui's corrupt offer does not mitigate Cui's offense conduct. Indeed, as noted earlier, Cui came to Burke with the bribe offer, not the other way around. Moreover, Cui's email messages make clear that the bribery was the result of a calculated and methodical strategy, and not the result of a single moment of emotionally-motivated poor judgment or desperation.

17

Cui's attempt to corrupt the legitimate functioning of government did not stop with his bribery of Burke. After hooking Burke's clout through the offer of tax business, Cui attempted to reverse the zoning denial for the pole sign permit by submitting fraudulent "evidence"—the doctored image—to the CDOB in order to supply CDOB with a plausible basis to conclude that the pole sign could be grandfathered in for permitting by virtue of having been continuously used. And Cui may have gotten away with it, if not for his terrible bad luck of having an honest and scrupulous civil servant with personal knowledge of the sign (Matthew Beaudet) assigned to review Cui's fraudulent evidence. Cui's attempt to perpetrate a fraud on the CDOB—even after it was exposed by Beaudet—only magnifies the odious nature of Cui's bribery offense.

Likewise for Cui's offense of lying to the FBI. Despite his sophistication and training as a licensed attorney, Cui willfully lied to the FBI agents in an attempt to thwart their investigation. With ice-water calm, Cui repeatedly lied to the agents by disclaiming any connection between his offer of tax business to Burke and his request from Burke for help with the pole sign permit. Indeed, at times during the interview, Cui even feigned irritation at the agents, who he claimed were barking up the wrong tree when it came to Burke. In reality, of course, Cui knew that the FBI was on exactly the right tree, but Cui chose to attempt to lie his way out of its branches. Cui's decision to lie to the agents (as opposed to simply refusing to speak with them) is particularly abhorrent because Cui, as a licensed attorney and an officer of the Court, was ethically obligated to uphold the rule of law and promote justice.

18

Under any objective metric, Cui's offense conduct was serious and repugnant to the rule of law and the effective functioning of government. His attempt to bribe his way out of a financial problem only deeply aggravates the public's already cynical view that politicians can be bought and wealthy developers can corrupt the system to their financial advantage. As an attorney, Cui's criminal conduct, including his lies to the FBI, further brings the legal profession into disrepute.

A Guidelines sentence will reasonably and adequately take into account the nature and circumstances of the offense, and will reflect the deeply serious nature of Cui's crimes.

**B.    The Need for the Sentence Imposed to Promote Respect for the Law and to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct (General Deterrence)**

For the same reasons, a Guidelines sentence will promote respect for the law, provide just punishment for the offense and will serve as a general deterrent. Such a sentence will not only adequately punish Cui individually for his conduct, but also serve as a clear benchmark that will have a strong deterrent effect upon other individuals who may one day contemplate attempting to corrupt government officials as a means of self-enrichment. That is especially true in public corruption cases, which are often the subject of broad media coverage, as this case has been.

The need for general deterrence is particularly strong for crimes that are lucrative and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to

19

detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Public corruption crimes certainly fall into that category but have an even greater need for general deterrence given that these crimes erode public trust in our government.

### C. Cui's History and Characteristics, and the Need to Protect the Public from Further Crimes by Cui (Specific Deterrence)

There are several aspects of defendant's history and characteristics that weigh in favor of a sentence at the low end of the Guideline range.

First, Cui was sophisticated. According to the PSR, Cui immigrated to the United States in 1995 from China, fleeing the communist government there. He subsequently sought higher education and earned MBA, JD, and LLM degrees. He enjoyed success in the United States as an attorney and real estate developer. As an educated and sophisticated attorney and businessman, Cui clearly knew what an illegal bribe was. Motivated by greed, he chose bribery as a means of obtaining benefits (the pole sign permit) to which he was not entitled, all for the purpose of increasing his wealth. As noted above, Cui's bribery of Burke and his attempt to perpetrate a fraud on the CDOB were the result of deliberation and strategy. He knew what the law prohibited, and he chose to put his desire for money over the rule of law, despite his training and experience as an attorney.

Second, Cui is without remorse. Cui has never accepted responsibility for his conduct in any fashion. Indeed, even after his bribery ultimately failed to secure the pole sign permit, Cui continued to denigrate the rule of law and shield himself from accountability by lying to the FBI and concealing material records from the grand

jury. These factors demonstrate that Cui places his personal wealth above the rule of law and any personal sense of honor, accountability, or ethics. Given his conduct, Cui's lack of remorse comes as no surprise—he is simply a person who views adherence to the law and its breach as merely two equal sides of a single transactional coin.

Third, Cui presents a strong risk of recidivism. At the end of his term of imprisonment, Cui will continue to pursue wealth through his business ventures. While one hopes that Cui has learned a lesson from this case, there is no objective basis upon which to rest that hope. Only a strict sentence will send the message to Cui that, should he re-offend, the consequences will be substantial and result in a substantial loss of his freedom.

### D. Unwarranted Sentencing Disparities, and the Sentence Imposed on Co-Defendant Burke

Finally, there is no concern that a sentence for Cui at the low end of the Guideline range will result in an unwarranted disparity, including with respect to the 24-month sentence that this Court imposed upon co-defendant Burke.

#### 1. General Considerations

Sentencing within the advisory Guidelines enhances the fairness, integrity, and public reputation of judicial proceedings. The legislative history of the Sentencing Reform Act of 1984 explains why this is so. Prior to the adoption of the

21

Guidelines, Congress studied the state of federal criminal sentencing and the indeterminate sentencing scheme then in place.

Congress was not at all pleased with what it saw. The Senate Judiciary Committee concluded that the sentencing system in place prior to the Guidelines was unjust, because there was a "shameful disparity" in criminal sentencing, a disparity that resulted in similarly situated defendants receiving sentences that varied wildly depending on the judge they appeared before and the district they were tried in. *See* S. Rep. No. 98-225 at 38, 65, 98th Cong., 1st Sess., 1984 U.S.C.C.A.N. 3182, 3221, 3248, 1983 WL 25404 (1983). The Committee pointed out that "[o]ne offender may receive a sentence of probation, while another—convicted of the very same crime and possessing a comparable criminal history—may be sentenced to a lengthy term of imprisonment. *Id.* This system of indeterminate sentencing was considered neither fair to the offender nor to the public, because a sentence that was unjustifiably high compared to sentences received by other defendants was unfair to the defendant, while an unjustifiably low sentence was unfair to the public. *Id.* at 39, 45, 1984 U.S.S.C.A.A.N. at 3222, 3228. As Senator Edward Kennedy, one of the co-sponsors of the Sentencing Guideline legislation, put it, "[f]ederal criminal sentencing is a national disgrace. Under current sentencing procedures, judges mete out an unjustifiably wide range of sentences to offenders convicted of similar crimes." 129 Cong. Rec. 1644 (1984).

The Guidelines were thus promulgated in part to foster public confidence in federal judicial proceedings by ensuring that similarly situated defendants received

similar sentences. In other words, the Guidelines were meant to ensure equal justice under law. *Cf.* U.S. Dep't of Justice, *Annual Report of the Attorney General*, 6, 7 (1938) ("there frequently occur wide disparities and great inequities in sentences imposed in different districts, and even by different judges in the same districts, for identical offenses involving similar states of facts," making "it difficult to maintain that equal, evenhanded justice is attained"). It was clear to Congress that respect for the law "cannot flourish among convicted defendants or the public when justice is undercut by unequal treatment." H.R. Rep. No. 1017, 98th Cong., 1st Sess. 31-32 (1983). It is for this reason that the Guidelines were implemented with bipartisan support—with Senators Edward Kennedy, Joseph Biden, Strom Thurmond, and Richard Lugar among the co-sponsors of the legislation.

Imposing a sentence at the low end of the Guideline range will serve the goal of ensuring similarly situated defendants receive similar sentences—regardless of where they are sentenced and what demographic they come from—and prevent the sentencing discrepancies that led to the Sentencing Guidelines in the first instance. *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017) ("the sentencing guidelines are themselves an anti-disparity formula"); *United States v. Sanchez*, 989 F.3d 523, 540-41 (7th Cir. 2021) (rejecting claims of unwarranted sentencing disparities where the sentence imposed was within the Guideline range; "[A] sentence

within a Guideline range necessarily complies with § 3553(a)(6).") (quotation omitted).

### 2. Co-Defendant Burke

On June 24, 2024, this Court sentenced Burke to serve a term of 24 months' imprisonment, as well as a fine and a term of supervised release. That custodial sentence was well below Burke's advisory guideline range as calculated by this Court (78-97 months' imprisonment). Comparatively, Burke is a more culpable and serious offender than Cui insofar as Burke, an elected public official, was convicted of bribery and extortion related offenses deriving from conduct unrelated to the pole sign permit episode.

In sentencing co-defendant Burke, however, the Court concluded that there were significant mitigating factors, including Burke's age. In short, those same mitigating factors simply are not present as to Cui so any disparity in the sentences is not unwarranted. Cui is relatively young, in good health, and will return to the business world. Therefore, sentencing Cui to a term of imprisonment at the low end of the applicable Guideline range does not result in an *unwarranted* sentencing disparity. *See*, *e.g.*, *United States v. Perez*, 21 F.4th 490, 494 (7th Cir. 2021) (rejecting defendant's claim of unwarranted sentencing disparity based upon the lower sentences imposed on his codefendants; "Because the judge correctly calculated and carefully reviewed the Guidelines range, [she] necessarily gave significant weight and consideration to the need to avoid unwarranted sentencing disparities.") (citation omitted). Consideration of all of the sentencing factors confirms that a sentence for Cui at the low end of the applicable Guideline range is warranted and appropriate.

## IV.    SUPERVISED RELEASE

The government agrees with the Probation Office that concurrent terms of two years of supervised release should be imposed on each of the five counts of conviction. A two-year term of supervised release is reasonable, appropriate, and will help ensure that Cui does not engage in future criminal activity, while also promoting respect for the law. The government also agrees with the Probation Office's recommended conditions of release, which the government refers to below by the same number listed in the PSR under the relevant heading, with any changes noted in brackets:

Mandatory Conditions of Supervised Release

1.  Defendant shall not commit another Federal, State or local crime.  (PSR at 28; 18 U.S.C. § 3583(d); necessary to ensure that defendant is not committing crimes and necessary to protect the public.)

2.  Defendant shall not unlawfully possess a controlled substance.  (PSR at 28; 18 U.S.C. § 3583(d); necessary to ensure that defendant is not committing crimes and necessary to protect the public from future crimes by the defendant.)

5.  Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.  (PSR at 29; 18 U.S.C. § 3583(d); necessary to protect the public from future crimes by the defendant.)

Discretionary Conditions of Supervised Release

1.  Defendant shall provide financial support to any dependents if financially able to do so.  (PSR at 29; necessary to ensure that defendant will satisfy his family financial responsibilities and reintegrate into society.)

6.  Defendant shall not knowingly meet or communicate with Edward Burke. (PSR at 29; necessary to ensure that defendant is not engaging in criminal activity.)

7.  Defendant shall refrain from [excessive] use of alcohol, and from any use of a narcotic drug or other controlled substance . . . without a prescription by a licensed medical practitioner.  (PSR at 29, 21 U.S.C. § 841; necessary for the safety of the community and to ensure the defendant is engaged in lawful pursuits.)

> Comment: The PSR does not check either box ("any" or "excessive"). The government recommends checking the box "excessive."

8.    Defendant shall not possess a firearm, destructive device, or other dangerous weapon. (PSR at 29, 18 U.S.C. § 922(g); necessary for the safety of the community.)

14.    Defendant shall not knowingly leave the Northern District of Illinois or Eastern District of Wisconsin unless granted permission to leave by the court or a probation officer. (PSR at 30; necessary to ensure that the Probation Office can effectively supervise and monitor the defendant.)

15.    Defendant shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. Defendant shall thereafter report to a probation officer at reasonable times as directed by the court or probation officer. (PSR at 30; necessary to ensure that defendant is engaged in lawful pursuits and is paying any outstanding fine or restitution, to help the defendant reintegrate into the community, to allow the Probation Office to effectively supervise the defendant, and to ensure the safety of the community.)

16.    Defendant shall permit a probation officer to visit him at any reasonable time at home or at another reasonable location specified by the probation officer. Defendant shall permit confiscation of any contraband observed in plain view of the probation officer. (PSR at 30; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant.)

17.    Defendant shall notify a probation officer within 72 hours after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. Defendant shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege. (PSR at 30; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant.)

18.    Defendant shall notify a probation officer within 72 hours after being arrested, charged with a crime, or questioned by a law enforcement officer. (PSR at 30; necessary to ensure that defendant is engaged in lawful pursuits, is not engaging in criminal activity, and to ensure the safety of the community and to ensure that the Probation Office can effectively supervise the defendant.)

Special Conditions of Supervised Release

3.  Defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 300 hours. (PSR at 32; necessary to ensure that defendant remains engaged in pro-social activity, there ensuring defendant's reintegration with society.)

5.  Defendant shall not incur new credit card charges or open additional lines of credit without the approval a probation officer unless defendant is in compliance with the financial obligations imposed by this judgment. (PSR at 32; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

6.  Defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release. (PSR at 32; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine and is not engaging in criminal activity.)

7.  Within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change. (PSR at 32; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

10. Defendant shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release. (PSR at 33; necessary to ensure that defendant is complying with any and all obligations to pay restitution and/or a fine.)

11. Defendant shall not enter into any agreement to act as an informant or special agent of a law enforcement agency without the permission of the court. (PSR at 32; necessary to ensure that the Probation Office can effectively supervise the defendant.)

## V.    RESTITUTION AND FINE

The government agrees with the Probation Office that restitution is not an issue in this case. PSR ¶¶ 133-134.

The government agrees with the Probation Office that, despite a claimed negative net worth, there is sufficient information from which to conclude that

defendant is capable of making an immediate payment toward a fine. *See* PSR ¶ 120. With a final offense level of 24, the fine range is $20,000 to $200,000, pursuant to Guideline § 5E1.2(c)(3). The government will reserve until the sentencing hearing a recommendation on an appropriate fine.

## VI.  CONCLUSION

For the foregoing reasons, the government respectfully submits that, in light of all of the sentencing factors, a sentence of imprisonment at the low end of the applicable Guideline range is fair and reasonable in this case.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Sarah Streicker*
    SARAH STREICKER
    AMARJEET S. BHACHU
    DIANE MacARTHUR
    TIMOTHY CHAPMAN
    SUSHMA RAJU
    Assistant United States Attorneys
    219 South Dearborn Street, 5th Floor
    Chicago, Illinois 60604
    (312) 353-5300