**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 19 CR 322-3 |
| | ) | |
| CHARLES CUI, | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Businessman and lawyer Charles Cui faced dire financial consequences to his commercial real estate development project if he did not obtain a pole sign permit and certain tax financing funds from the City of Chicago. The Government contended that Cui took matters into his own hands, offering Ed Burke—the powerful 14th Ward Alderman and Chair of the Committee on Finance for the City Council—legal business in exchange for his assistance. On May 30, 2019, a grand jury returned a Superseding Indictment charging Cui with five counts of corruptly offering or agreeing to give things of value; using interstate commerce to promote such unlawful activity; and making false statements to the Federal Bureau of Investigation. (Dkt. 30). Following a six-week trial, a jury convicted Cui on all five counts. (Dkt. 395). At the close of evidence, Cui moved for a judgment of acquittal on those counts. (Dkt. 379). Cui now renews his motion for a judgment of acquittal and also moves for a new trial. (Dkts. 448, 449). For the following reasons, Cui's motions [379, 448, 449] are denied. The jury's verdict stands.

## BACKGROUND

A May 30, 2019 Superseding Indictment alleged former 14th Ward Alderman Ed Burke exploited his position on the Chicago City Council in four "episodes": the (1) Post Office; (2) Burger King; (3) Pole Sign; and (4) Field Museum. (Dkt. 30; *see* Dkt. 504 at 4–10). Within the Pole Sign episode, the Government indicted Charles Cui, a Chicago-based businessman and immigration attorney, for offering a bribe to Burke and making false statements to the FBI. (Dkt. 30, Counts 12–15, 17). Specifically, the Indictment charged Cui with one count of offering a bribe to a public official in violation of 18 U.S.C. § 666(a)(2), three counts of using interstate commerce in furtherance of such activity in violation of 18 U.S.C. § 1952(a)(3), and one count of making false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2).[1]

The trial spanned roughly six weeks. At the conclusion of the evidence and the parties' arguments, the Court read the jury 326 pages of instructions. (Dkt. 384). After deliberating for approximately four days, the jury found Cui guilty of all five counts. The convictions against Cui and his various challenges are laid out below:

| Count(s) | Violation(s) | | Description | | Challenge |
|---|---|---|---|---|---|
| **12** | 18 U.S.C. § 666(a)(2) | | Bribery — Offering | | Rule 29<br>Rule 33 |
| **13, 14, 15** | 18 U.S.C. § 1952(a)(3) | | Travel Act | | Rule 29<br>Rule 33 |
| | | 720 ILCS 5/33-1(a) | | Bribery | |
| | | 720 ILCS 5/33-1(d) | | Bribery | |
| | | 720 ILCS 5/29A-1 | | Commercial Bribery | |
| **17** | 18 U.S.C. § 1001(a)(2) | | False Statements | | Rule 29 |

---

[1] Defendants Burke and his associate Peter Andrews were also charged with corruption-related counts. The jury acquitted Andrews of all counts in which he was charged. (Dkt. 393). The jury convicted Burke on thirteen counts, (Dkt. 392), and the Court denied Burke's motions for acquittal and a new trial in a separate opinion, (Dkt. 504).

At the close of the Government's case, Cui moved orally for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) for all counts in which he was charged. (Dkt. 430 at 4090:14–17). Cui also filed a written motion that same day, (Dkt. 379), which the Court took under advisement, (Dkt. 430 at 4091:7). On February 8, 2024, Cui renewed his motion for a judgment of acquittal under Rule 29 and also moved for a new trial under Rule 33. (Dkts. 448, 449).

## I. Relevant Factual Summary

The Court assumes familiarity with the facts of this case from its previous rulings. (*See* Dkts. 196, 317, 504). For efficiency, the Court recounts only the evidence pertinent to Cui's arguments and a basic understanding of the events.

### a. Pole Sign

Since 2014, Cui served as the sole member and manager of Irving Park Property Holdings, LLC. (GX 455). The jury heard evidence that in 2015, Cui entered into a lease agreement with Binny's Beverage Depot for a commercial property located at 4901 West Irving Park Road ("4901 Property"). (GX 407). The lease agreement was for a period of 15 years, with the option to renew for up to seven five-year extensions. (*Id.*) In June 2016, Cui entered into a redevelopment agreement with the City of Chicago. (GX 414). The redevelopment agreement provided Cui's company with up to $2 million in tax increment financing ("TIF") funds from the City of Chicago to finance the redevelopment of the 4901 Property.[2] (GX 410, 411). The City would distribute the TIF funds by September 2017, at the completion of the redevelopment project. (GX 414)

---

[2] TIF funding is a "special funding tool used by the City of Chicago to promote public and private investment across the City." (Dkt. 461 at 2). The Chicago City Council—with Burke's support as Chairman of the Finance Committee— passed an ordinance in March 2016 providing Cui with up to $2 million in TIF funds. The parties entered into a stipulation regarding the passage that "the redevelopment agreement was negotiated and entered into prior to the time period of the offenses charged[.] . . . There is no allegation of wrongdoing in connection with the negotiation, development, or passage of the redevelopment agreement." (Dkt. 433 at 4379:3–15).

In exchange for the TIF funds, Cui was required to lease the 4901 Property back to Binny's. (GX 414). In that lease, Cui gave Binny's the exclusive right to use the pole sign in front of the property. (GX 407). Binny's then applied to the Chicago Department of Buildings ("CDOB") for a pole sign permit in April 2017, which was denied. (GX 418, 453; *see* Dkt. 427 at 3724–28). CDOB's Bureau of Zoning determined the property had been re-zoned for pedestrian use. (GX 281, 453, 604). And the pole sign was ineligible for a non-conforming use as it was vacant since 2011 or 2012. (*Id.*) After the denial, Cui entered a lease addendum that gave Binny's a rent reduction if Cui did not obtain a pole sign permit by October 2017. (GX 424). The stakes were high: If Cui failed, he would lose about $750,000 in rent revenue over the lease period and potentially the TIF funds. (GX 270, 304).

The pole sign was in the 45th Ward. Yet Cui chose to email Burke, the 14th Ward Alderman, in August 2017. (GX 270). Burke is the longest-serving member of Chicago's City Council, serving as both the 14th Ward Alderman from 1969 to 2023 and the Council's Chairman of the Committee on Finance from 1989 to 2019. Concurrently, he also owned a private law firm, Klafter & Burke, that represented clients in property tax assessment contests and appeals.

On August 23, 2017, Cui called Burke and left a voicemail noting that he needed help on a legal matter. (GX 79, 80). In a follow-up email, Cui told Burke that Binny's pole sign permit was "denied by zoning" for falling out of use, and "now [the sign] is illegal." (GX 270). He asked Burke to "look into the matter" and asked, "how to proceed" because he faced serious financial repercussions. (*Id.*) Namely, Binny's may "cancel the lease" and ask for a significant reduction, and Cui might fail to receive the TIF funds disbursement. (*Id.*)

Cui had not heard back from Burke by the next day. He forwarded Burke's email to a mutual friend, Ray Chin, and noted "[m]aybe [Burke] thinks there is conflict of interest, because

of his position. I'll ask him to represent me for property tax appeal, which will be a big bite, comparing with this." (GX 271). Shortly after expressing his plan to Chin, Cui emailed his property tax appeal attorney, George Reveliotis, asking for a "favor"—to shift the 4901 Property's tax appeal work to Burke "at least for this year." (GX 272). Cui explained that he "ha[d] [a] TIF deal going with the City, and [Burke] is the Chairman of Finance Committee." (*Id.*) Thus, Cui, "need[ed] [Burke's] favor for [his] tif money" and "help for [his] zoning" issue. (*Id.*) Cui ended by emphasizing to Reveliotis that Burke "is a powerful broker in City Hall, and [Cui] need[s] him now" but that Cui would transfer the work back to Reveliotis after the year. (*Id.*)

Almost immediately after sending Reveliotis this email, Cui emailed Burke offering him tax appeal work for the 4901 Property. (GX 273). Burke then replied that someone with his law firm would be in touch with Cui to move forward. (*Id.*) On August 30, 2017, an attorney at Burke's law firm reached out to Cui to formalize Klafter & Burke's property tax appeal work representation. (GX 277). That same day, Burke directed his assistant to reach out to CDOB Commissioner Judy Frydland to "see if she'd . . . review [the pole sign permit] and see if they . . . can . . . help [Cui]." (GX 88). Burke also separately called Frydland on August 31, 2017 and left Cui's information with her. (Dkt. 425 at 3507–10; *see* GX 301). Burke's assistant then replied to Cui's original August 23, 2017 email about the pole sign and confirmed that Frydland would reach out to him. (GX 270).

On September 1, 2017, Cui emailed his zoning attorney, Tom Moore, with an image that depicted the pole sign in use for advertising tenancy opportunities. (GX 278, 282). Cui asked Moore to contact Frydland and relay the message that the pole sign had been in continuous use, which would be a basis to grant the permit as a non-conforming use. (GX 278). Moore did so. (GX 280, 282). Yet, in an email to Frydland and Moore, CDOB First Deputy Commissioner Matt

5

Beaudet reaffirmed the denial, based, in part, on his personal knowledge of the pole sign's lack of continuous use and conclusion that Cui's image was photoshopped. (GX 281, 284).

Cui passed along Beaudet's assessment to Burke, noting "First Deputy Commissioner Matt Beaudet has issue with this." (GX 279). Cui also emailed Frydland and explained that the photoshopped image was from his "broker." (GX 286). The following week, Frydland emailed Burke's assistant, informing her that the permit denial was reaffirmed, and that Cui submitted a photoshopped image of the pole sign. (GX 95). As a next step, Frydland suggested that Burke contact Zoning Administrator Patti Scudiero regarding the denial. (*Id.*; Dkt. 426 at 3538–40). Burke did so to see if she could "look into," or review, the denial. (*See* Dkt. 427 at 3728). Ultimately, Scudiero took no further action. On September 5, 2017, Cui entered into a contingency fee agreement with Klafter & Burke for the tax appeal work. (GX 277, 427). The pole sign was removed in the fall of 2017. (*See* Dkt. 427 at 3787:23).

### b. FBI Interview

On November 29, 2018, the FBI interviewed Cui at his office located at the 4901 Property. (GX 145; Dkt. 427 at 3840–47). The Indictment charged three false statements made by Cui to the FBI agents: that Cui (1) "made no business offers to Burke during the pole signage matter"; (2) "offered business to Burke 'just because he is a good tax appeal lawyer' "; and (3) "[t]he information Cui provided to federal agents during his interview was accurate to the best of his knowledge." (Dkt. 30, Count 17).

Specifically, the interview transcript reads:

- Agent: Okay, did you, did you ever, um offer to, um offer [Burke] business again after—
- Cui: No.
- Agent:—he had represented you before, did you ever offer business to him again, right around the time when you were seeking help about the pole sign issue?
- Cui: No.

. . .

- Agent: But you don't recall ever offering Mr. Burke business during the time when you're trying to resolve the pole sign issue?
- Cui: No, I offered Mr. Burke business a while ago, just because he's a good tax appeal lawyer.

(GX 145 at lines 752–61, 902–09, 1163–67). At trial, the Court admitted into evidence the entire approximately forty minute recorded conversation between Cui and the agents. (Dkt. 363).

## DISCUSSION

### I. Rule 29 Motion for Judgment of Acquittal

#### a. Legal Standard

A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction" either after the government has closed its evidence or within fourteen days after a jury has rendered a verdict. Fed. R. Crim. P. 29(a), (c)(1); *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). A court will overturn the jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (quoting *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014)); *see also United States v. White*, 95 F.4th 1073, 1078 (7th Cir. 2024); *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016) ("A defendant faces an uphill battle in challenging the sufficiency of the evidence."); *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (describing defendant's challenge as a "nearly insurmountable hurdle"). Further, courts "do not re-weigh the evidence or second-guess the jury's credibility determinations." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). "In short, if there is a reasonable basis in the record for the verdict, it must stand." *White*, 95 F.4th at 1078 (cleaned up).

### b. Count Twelve, 18 U.S.C. § 666(a)(2)

Count Twelve charged Cui with federal program bribery for corruptly offering or agreeing to give legal fees involving $5,000 or more to Burke with the intent to influence or reward Burke in connection with some business of the City of Chicago. (*See* Dkt. 30 at 50–51); 18 U.S.C. § 666(a)(2). The Court instructed the jury that an act is "in connection with some business" of the City of Chicago—or an "official action"—if it is a "formal exercise of governmental power." (Dkt. 384 at 242).

To preface, individuals in Chicago may deal with Chicago aldermen in their "second jobs" or outside employment. Yet, dealings with a public official may cross the line into federal program bribery when the bribe-giver offers a thing of value to the public official with the intent to influence them in their official action. The jury found that Cui crossed that line when he knowingly offered Burke lucrative tax appeal work in order to ensure he received financial benefits from his redevelopment project. Though Cui attempts to downplay the criminality of his actions, the law supports the Government's theory and the jury's determination. Under the stringent standard of viewing the evidence in the light most favorable to the Government and deferring to the jury's credibility determinations and rational inferences, the Court finds that the record substantiates Cui's guilty verdict on Count Twelve.

### i. Bona Fide Compensation under 18 U.S.C. § 666(c)

First, Cui argues that he retained Burke's law firm as bona fide compensation paid in the usual course of business and should be exempted under 18 U.S.C. § 666(c)'s safe harbor provision. For its part, the Government argues that Cui's offer of tax appeal work was made for the express purpose of influencing Burke in his official capacity, constituting a bribe, rather than a bona fide arrangement. (*See* Dkt. 448 at 3–6; Dkt. 460 at 22).

Under § 666(c), "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business" are exempted from the statute's coverage. 18 U.S.C. § 666(c). The safe harbor is an affirmative defense to be raised at trial. *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010).[3] Cui raised this theory to the jury at trial and they were properly instructed.[4] Here, a reasonable jury could find that Cui's engagement of Burke was not in the "usual course of business" or "bona fide" because the legal work was the *quid* or bribe in a scheme to influence Burke in his official capacity. In fact, Cui's written intent in his emails to Chin and Reveliotis and the timing and circumstances of his offer support the jury's finding. *See United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009); *United States v. McClain*, 2024 WL 50868, at *7 (N.D. Ill. Jan. 4, 2024) (collecting cases and noting that courts assessing § 666(c)'s application analyze corrupt intent, actions, behavior of the defendant, and whether the defendant was entitled to the money, among other factors).

CDOB's denial of the pole sign permit jeopardized the Binny's lease agreement's financial viability and disbursement of the $2 million in TIF funds. Facing serious financial repercussions, the evidence showed that Cui sought out Burke specifically for his position as a "powerful broker" in City Hall. Cui was not Burke's constituent, nor was the pole sign and redevelopment project located in Burke's ward. Yet, Cui identified Burke, noting to Chin that "because of [Burke's] position" he was planning to give him a "big bite" of tax appeal work.

Cui's also made his intention behind the offer of legal work clear to Reveliotis, Cui's tax appeal attorney. In justifying that he had to transfer some of the city-related tax appeal work to

---

[3] Cui first raised this argument at the motion-to-dismiss stage, where the Court, through Judge Dow, noted that whether any fees Cui agreed to pay were made "in the usual course of business" was a "jury question." (Dkt. 196 at 59).

[4] The jury instructions stated that "[b]ona fide fees or other compensation paid in the usual course of business do not qualify as a thing of value solicited or demanded, given, offered, or agreed to be given by the defendant." (Dkt. 384 at 243).

Burke for the year, Cui again leaned heavily on Burke's position as Chairman of the Finance Committee and "powerful broker in City Hall." In fact, Burke's position was the very reason Cui "need[ed]" him for the TIF funds and pole sign permit. No where did Cui mention Klafter & Burke's excellent track record, legal prowess, or other rationales that Cui now raises to frame this arrangement as compensation in the "usual course of business." In fact, Cui's email to Reveliotis established that Cui in fact already had a property tax appeal attorney handling the work. The jury could thus reasonably infer that Cui sought to hire Burke for no other reason than to influence him in his official action for Cui's own financial benefit. *See United States v. Whiteagle*, 759 F.3d 734, 756 (7th Cir. 2014) (noting the jury could reasonably infer that a hiring an individual for a duplicate position was to influence or reward a public official for his assistance).

Further, the timeline of events supports the jury's rejection of the § 666(c) safe harbor. Cui emailed Burke asking for assistance with the pole sign permit and explained the financial repercussions he faced. The next day, Cui received no response. He then expressed his plan to Chin and Reveliotis to give Burke legal work, which the jury could infer, based on Cui's own words, was to compensate and incentivize Burke to conduct an official action on Cui's behalf. Minutes later—and within a day of his original email—Cui emailed Burke with the offer.

In light of the evidence in Cui's own words explaining his rationale behind offering Burke legal work, the jury was permitted to find that the engagement of Klafter & Burke was not "bona fide" or in the "usual course." Rather, the offer of legal work itself was the "thing of value" offered by Cui with the intent to influence of reward under § 666(a)(2). *See United States v. Bryant*, 556 F.Supp.2d 378, 427 (D.N.J. 2008) (holding that § 666(c) was inapplicable to salary payments that were allegedly the *quid* of the *quid pro quo*). In fact, that Cui offered Burke legal work under a guise of legitimate business services displays a deeper intent to conceal the true nature of the

payment. *Lupton*, 620 F.3d at 802 ("Cash payments, payments to sham companies, and mischaracterization of payments are hallmarks of concealment and fraud."). Moreover, whether Cui's conduct was technically allowed under local and state ethics laws and regulations has no bearing on the jury's conclusion. As the Court repeatedly instructed—and Cui himself requested— the jury could not apply Burke's violation or compliance with local and state ethics laws when evaluating Cui's guilt. (*See* Dkt. 434 at 4613:17–22).

That Burke conducted the legal work for "real" properties is also no matter. Under Cui's interpretation, only "sham" transactions fall outside of § 666(c)'s ambit. [5] Cui primarily relies on *United States v. Mills* to argue that since Cui ultimately received legal services from Burke, the fees constitute bona fide compensation as a matter of law. 140 F.3d 630, 634 (6th Cir. 1998). In *Mills*, the Sixth Circuit found § 666(c) applied where the indictment failed to allege paid jobs "were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their positions." *Id.* at 633. Yet, the court's ruling was in part based on the indictment's failure to allege the $5,000 transactional value under § 666. *Id.* at 634. Further, *Mills* seems to suggest that the § 666(c) exception would *not* apply if the government had proved that the salaries paid for the jobs were unjustified. The Court is disinclined to adopt *Mill*'s nonbinding and broad reasoning when considering the weight of cases finding that legitimate payments can fall outside of § 666(c)'s exception; especially where, as here, the legitimate payment is alleged to be the bribe itself. *See, e.g.*, *Bryant*, 556 F. Supp. 2d at 428 (analyzing *Mills* and finding it distinguishable where the "salary itself constitutes the bribe"); *United States v. Cornier–Ortiz*, 361 F.3d 29 (1st Cir. 2004) ("That the payments were made for a

---

[5] Cui incorporates his arguments regarding § 666(c) made in his motion to dismiss. (Dkts. 89, 153). Judge Dow analyzed and rejected Cui's prior arguments, and the Court incorporates that analysis by reference here. (Dkt. 196 at 59–63) (noting that it would be "untenable" that Cui could "cleanse the tainted procurement process if he receives *some* non-sham services").

legitimate purpose . . . does not render them bona fide under the statute if they were intentionally misapplied."); *see also United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007) (collecting cases where legitimate employees received payments that were not covered by § 666(c)). Thus, the jury could properly accept the Government's theory that the offer of legal fees to Burke was unjustified and intentionally used to cover up a payment made to influence an official action.

Finally, it is irrelevant that Burke's and Cui's agreement was contingent. Under § 666(a)(2), Cui had to offer the legal work with the requisite intent. *United States v. Mitziga*, 2024 WL 383670, at *3 (N.D. Ill. Feb. 1, 2024) (rejecting a similar argument that proof of an actual loss is required); *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013); *United States v. Lupton*, 2008 WL 647028, at *3 (E.D. Wis. Mar. 5, 2008) ("The wire fraud statute punishes a scheme, not its success[.]" (first citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005); and then *United States v. Blitz*, 151 F.3d 1002, 1011 (9th Cir. 1998))). At this stage, the Court cannot take the same facts and make inferences in Cui's favor. Cui's characterization of his conduct was a theory the jury was allowed to reject. Ultimately, Burke was not permitted to sell his office for legal work, nor could Cui offer such legal work, and then benefit from the use of § 666(c)'s safe harbor.

### i. Intent and *Quid Pro Quo*

Next, Cui challenges the jury's finding as to his corrupt intent and the existence of a *quid pro quo* between himself and Burke. The Court addresses these arguments together. Cui's attacks on the evidence surrounding his corrupt intent echoes his previously attempted—and rejected—characterization of Cui's engagement of Klafter & Burke as a bona fide business transaction occurring in the usual course of business. Overall, Cui's arguments are misplaced.

Cui argues that there is no evidence that (1) Cui and Burke discussed the TIF funds; (2) Cui and Burke discussed the pole sign permit; (3) Cui obtained the pole sign permit; or (3) Burke

obtained anything of value from Cui. (*See* Dkt. 448 at 1). First, the evidence supports the jury's reasonable finding that Cui possessed corrupt intent in offering Burke the legal work in exchange for his actions on the pole sign permit. Under § 666(a)(2), a person acts corruptly when he acts with the intent to offer or give something of value to influence or reward a government agent in connection with the agent's official duties. (*See* Dkt. 384 at 239); *Mitziga*, 2024 WL 383670 at *4. In other words, Cui must understand that the payment given is a bribe or reward. *See United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015). Whether he ultimately obtained the pole sign permit or gave Burke the legal fees are irrelevant to his intent. *Whiteagle*, 759 F.3d at 753 ("It was not necessary for the government to prove as to these counts that [the legislator] actually received the bribes [under § 666(a)(2)]."); *United States v. McClain*, 2022 WL 488944, at *3 (N.D. Ill. Feb. 17, 2022) ("However, the plain text of the statute demonstrates there does not have to be proof that the agent of local government received the illegal gratuity with requisite intent, only that the person attempting to provide the illegal gratuity 'corruptly gives, offers, or agrees to give' a thing of value." (citing *Whiteeagle*, 759 F.3d at 753)).

Cui's commission of the crime was complete at the moment he offered the legal fees with the requisite intent to influence Burke's official action.[6] *See Lupton*, 2008 WL 647028, at *3 ("[T]he anti-bribery statute covers the solicitation of a bribe as well as it's receipt." (citation omitted)); *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 172 (2018) ("[A] defendant completes the crime [] of bribery as soon as he gives or offers payment in exchange for an official act."); *see also United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997) (noting that section 666(a)(2) focuses on the offer of a bribe, whereas section 666(a)(1)(B)

---

[6] Section 666(a)(2), under which Cui was charged, captures bribe-givers. Section 666(a)(1)(B), under which Burke was charged in Count Eleven, contains the parallel offense of soliciting or accepting a bribe. These "two subsections cover anyone who gives or takes a bribe with the prohibited intent." *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011).

criminalizes the receipt of the bribe); *Ring*, 706 F.3d at 467 (stating an official need not accept the "mere 'offer' " of something of value to violate federal bribery provisions). Thus, the relevant inquiry is whether Cui offered to give a bribe to Cui with the intent to influence or reward him in connection with business of the City of Chicago. As already discussed, the jury had sufficient evidence to find just that. *See supra*, pp. 8–12.

Moreover, Cui and Burke did not need to share the same intent in order to be guilty of § 666(a)(2). *See Suhl*, 885 F.3d at 1112 ("Neither [the honest-services fraud or federal-funds bribery] statutes, nor *McDonnell*, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act."); *United States v. Jennings*, 160 F.3d 1006, 1017 (4th Cir. 1998) ("The intent of the payor, not the intent of the payee, is determinative of whether a crime occurred."); *see also United States v. Silver*, 948 F.3d 538, 548–50 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021) ("Nothing [the defendant] points to suggests that the payor and recipient must share a common purpose")); *United States v. Burke*, 2022 WL 1970189, at *56 (N.D. Ill. June 6, 2022).

As further discussed in Cui's motion for a new trial, *infra* pp. 23–26, the evidence supported a bribery theory of the case. Here, Cui and Burke established the "ask" and "give" up front: Cui asked Burke for assistance with the pole sign permit and noted its implications on his TIF funds. He then offered Burke a "big bite" of legal work in exchange for that assistance. Only after Burke accepted Cui's offer by replying to the email and directing his firm to move forward with formalizing the representation did Burke began taking official action on behalf of Cui with respect to the pole sign permit, with knowledge and expectation of the legal fees. This timeline of events is consistent with a bribery theory and comports with a before-the-fact agreement. Moreover, the agreement between the two "need not be explicit." *McDonnell v. United States*, 579

U.S. 550, 572 (2016); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (" 'Nudge, nudge, wink, wink, you know what I mean' can amount to [a *quid pro quo*]."); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001) ("[T]he government need not show an explicit agreement, but only that the payment was made in return for official acts."). Rather, "[i]t is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo* . . . considering a broad range of pertinent evidence." *McDonnell*, 579 U.S. at 572–73.

In sum, the Court will not re-weigh the evidence or second-guess the jury's credibility determinations in Cui's favor now. *See Taylor*, 637 F.3d at 815–16. The jury had sufficient evidence considering the context of the emails and timing and circumstances of the events to find Cui's corrupt intent. That is to say, a jury could reasonably conclude that Cui knew what he was doing when he made the offer and thus violated § 666(a)(2).

### ii. Official Action

Under § 666(a)(2), Cui had to act with corrupt intent to influence or reward Buke "in connection with any business, transaction, or series of transactions" of the City of Chicago; or in other words, an official action. (Dkt. 384 at 239). Cui argues that Burke did not take or agree to take an "official act" under the meaning of *McDonnell v. United States*, 579 U.S. 550 (2016), thereby compelling Cui's acquittal under § 666(a)(2). (Dkt. 448 at 10–13).

The Court thoroughly exhausted *McDonnell*'s implications for § 666 and the state law bribery predicates when upholding Burke's corresponding conviction under Count Eleven. (Dkt. 504 at 28–34). Moreover, fatal to Cui, the jury could properly find him guilty of violating § 666(a)(2) even if Burke did not in fact perform an official act. (Dkt 384 at 242); *see Suhl*, 885 F.3d at 1113 ("[A] defendant completes the crime [] of bribery as soon as he gives or offers

15

payment in exchange for an official act."); *United States v. Lee*, 919 F.3d 340, 351 (6th Cir. 2019) (noting an official could be convicted under § 666 without taking an official action, if the jury found the official agreed to take an official act); *United States v. Jackson*, 371 F. Supp. 3d 257, 267 (E.D. Va. 2019). Cui's argument that Burke did not take official action is further foreclosed now that the Court determined the evidence and law supported a finding that Burke did take official action related to the pole sign permit under § 666(a)(1)(B).

As previously outlined when considering Burke's substantially similar arguments, neither § 666 nor the Illinois bribery statutes charged as the underlying unlawful activity of the Travel Act counts contain the phrase "official act." For § 666 specifically, the Seventh Circuit Pattern Jury Instructions note that although "Section 666 does not use the term 'official act,' and instead uses 'any business, transaction, or series of transactions of such organization, government, or agency' . . . lawyers and judges should consider the potential impact of *McDonnell* on § 666 cases." Seventh Circuit Pattern Criminal Jury Instructions § 666(a)(1)(B), Committee Comment (2023). In contrast, there is no indication that *McDonnell* applies to state law bribery statutes.

Thus, over the Government's objection, the Court gave a more stringent instruction than the text of the statutes called for but declined to wholesale adopt *McDonnell* into its instructions. (*See* Dkt. 309 at 12, 14) (noting the *quo* in § 666 is broader than § 201 and collecting cases). For Count Twelve, the Court instructed the jury that a public official engages in an "official action" if it is a "formal exercise of governmental power." Further, the Court instructed that,

> A public official engages in an "official action" when he uses his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official.

> In addition, the government does not need to prove that the government official had the power to or did perform the act for which he was given or received something of value.

> However, a public official does not take official action if he does no more than

set up a meeting, host an event, or call another public official.

(*See* Dkt. 384 at 242). This language was taken in part from *McDonnell* and sought to strike a balance between *McDonnell*'s constitutional concerns and the federalism concerns that, in contrast to § 201, point towards retaining the relevant statutes' exact language. With this backdrop in mind, the Court found sufficient evidence for the jury's finding that Burke engaged in two "official actions" related to the § 666 pole sign charge. (Dkt. 504 at 28–34). First, contacting CDOB Commissioner Judy Frydland to assist with securing Cui's pole sign permit. (*See* Dkt. 425 at 3509). Second, asking Zoning Administrator Patti Scudiero to review Cui's pole sign permit denial. (*See* Dkt. 427 at 3728).

The Court thus rejected Burke's attempts, and now Cui's, to improperly graft additional requirements from *McDonnell* beyond what the jury was instructed. The Court ultimately found that the evidence supported a reasonable jury's finding that Burke used his official position to exert pressure or advise Frydland and Scudiero to perform an official act in connection with the pole sign permit. Burke, an alderman, contacted Scudiero and Frydland, CDOB officials, intending to advise them, or pressure them, to reevaluate a closed denial of a pole sign permit over which they had power. Additionally, although Frydland and Scudiero did not testify that they felt "pressured" and did not reverse the permit denial, success is not an element of the crime: The jury need not find that Burke "had the power to or did perform the act for which for which he was given or received something of value." (Dkt. 384 at 236); *Lee*, 919 F.3d at 352, 356 (rejecting contention that an official can only "exert pressure" on a second official if the first official has "leverage or power" over the second official). Ultimately, the jury convicted Burke and Cui under the Court's instructions that took *McDonnell* into account for § 666 and found under the more stringent instructions that Burke engaged in an "official action" as to the pole sign permit. And Cui acted with the intent to influence or reward Burke with respect to that official action. Therefore, even

17

though Cui's guilt did not hinge upon Burke's completion of an official action, *Lee*, 919 F.3d at 351, Burke did in fact take official action. In sum, the jury's verdict on Count Twelve stands.

### c. Travel Act, 18 U.S.C. § 1952(a)(3) — Counts Thirteen, Fourteen, and Fifteen

The Travel Act criminalizes, in relevant part, the use of "the mail or any facility in interstate or foreign commerce, with intent to . . . otherwise promote, manage, establish, carry on, or facilitate . . . any unlawful activity." 18 U.S.C. § 1952(a)(3); (Dkt. 384 at 245, 257, 269). The government need not prove the defendant violated the specified state law, only that the federal crime uses interstate facilities to further the unlawful activity. (*See* Dkt. 384 at 272); *United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000) (citing *United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991)). Accordingly, a conviction under the Travel Act "does not require that the state crime ever be completed." *Id.* In fact, "reference to state law is necessary only to identify the type of unlawful activity in which the defendant[] intended to engage." *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970). "Unlawful activity" can include "bribery in violation of the laws of the state in which committed." *United States v. Isaacs*, 493 F.2d 1124, 1145 (7th Cir. 1974), *overruled on other grounds by McNally v. United States*, 438 U.S. 250, 359 (1987); (*see also* Dkt. 196 at 130–31; Dkt. 504 at 35).

To convict Cui of Counts Thirteen, Fourteen, and Fifteen, the jury had to find at least one of the following unlawful activities for each count: 720 ILCS 5/33-1 (bribery), 720 ILCS 5/33-3(a)(4) (official misconduct), 720 ILCS 529A-1 (commercial bribery), and 720 ILCS 5/29A-2 (commercial bribe receiving). (Dkt. 395 at 17–19). The instructions required the jury to find the email "was used in aid of at least one of the unlawful activities specified." (*See* Dkt. 384 at 272). Relying on the August, 24 2017 emails from Cui to Reveliotis and Burke, and the August 30, 2017

email from Cui to a lawyer at Klafter & Burke, the jury found that for all three counts, Cui furthered bribery (720 ILCS 5/33-1(a), (d)) and commercial bribery. (Dkt. 395 at 17–19).

Cui's attempts to retool his challenges to his § 666(a)(2) conviction are unavailing. The evidence supported a finding that Cui's emails in the days surrounding his offer to Burke were "in aid of" the identified unlawful activities of bribery and commercial bribery. On August 24, 2017, Cui sent Reveliotis an email describing his plan to offer Burke legal work. He then emailed Burke with the offer. Lastly, Cui corresponded with Klafter & Burke to finalize their representation. In light of the evidence presented for the substantive § 666(a)(2) count, the jury could find that these emails were in aid of the unlawful activities of bribery and commercial bribery. And the jury did not need to find that Cui actually committed these state law unlawful activities. Additionally, the jury only needed to find one unlawful activity to convict under Counts Thirteen, Fourteen, and Fifteen—here they found three.

Moreover, Cui primarily argues that the Government failed to prove evidence of his "specific intent" to violate the Travel Act. Cui's attempt to read a specific intent element into each charged email misapprehends the law. First, each use of the interstate facility need not be "indispensable to the illegal activity" of federal program bribery; "it is enough that the use facilitates" the unlawful activity, here the identified Illinois state law predicates. *United States v. Muskovsky*, 863 F.2d 1319, 1327 (7th Cir. 1988). Thus, the jury did not need to determine whether each individual email was a bribe to conclude that the emails facilitated the carrying on of bribery and commercial bribery. *See Campione*, 942 F.2d at 434.

Further, the intent element of the Travel Act "applies to the purpose of the travel" and does not require a specific intent. *United States v. Markowski*, 772 F.2d 358, 365 (7th Cir. 1985); *see also United States v. Miller*, 379 F.2d 483, 486 (7th Cir. 1967) ("If Congress had intended to

require specific intent with respect to the use of the interstate facility, the phrase 'with intent to' or its equivalent would have been juxtaposed to modify 'uses' in Section 1952(a)."). Thus, Cui had to intend that his emails had the purpose of carrying out his effort to influence or reward Burke with respect to the pole sign permit and TIF funds. The jury reasonably inferred from his words and the timing and circumstances of the events that Cui had the requisite unlawful intent to find him guilty on these counts. *See supra*, pp. 8–15. For these reasons, the convictions on the Travel Act counts stand.

### d. False Statements, 18 U.S.C. § 1001(a)(2) — Count Seventeen

To violate § 1001(a)(2), a defendant must make a statement that is (1) false, (2) material, (3) knowingly and willfully made, and (4) concerns a matter within the jurisdiction of a federal department or agency. 18 U.S.C. § 1001(a)(2); *United States v. Clark*, 787 F.3d 451, 459 (7th Cir. 2015) (citing *United States v. Turner*, 551 F.3d 657, 662 (7th Cir. 2008)); (Dkt. 384 at 292).

The Indictment charged three false statements made by Cui in his November 29, 2018 interview with the FBI agents: that Cui (1) "made no business offers to Burke during the pole signage matter"; (2) "offered business to Burke 'just because he is a good tax appeal lawyer' "; and (3) "[t]he information Cui provided to federal agents during his interview was accurate to the best of his knowledge." (Dkt. 30, Count 17).

Cui's arguments for acquittal attack the first and third elements. He argues that the Government's evidence established that Cui was "truthful and cooperative" and the Government's FBI agent witness "admitted that everything Mr. Cui said in the interview was true." (Dkt. 448 at 24–25). First, the evidence presented overwhelmingly supported a reasonable finding that Cui's statements were false. As outlined when upholding Count Twelve, *supra* pp. 8–15, the Government presented evidence that Cui offered Burke legal work the day after he requested

assistance with the pole sign permit. The emails and calls that Cui sent, as well as the timing and circumstances of the request for Burke's help on the pole sign permit and follow-up offer, directly contradicted Cui's statement that he "made no business offers to Burke during the pole signage matter." As to the second statement, the jury was permitted to disbelieve that Cui offered the legal work to Burke "just because he is a good tax appeal attorney." In fact, Cui's stated intentions in his email to Reveliotis and Chin contradicted this claim. (*See* GX 271 (noting Cui's plan to hire Burke "because of his position"); GX 272 (Burke "is a powerful broker in City Hall, and [Cui] need[s] him now")). In fact, the jury reasonably rejected Cui's theory that he hired Burke in a bona fide legal transaction due to Burke's skill as an attorney, *supra* pp. 8–12. Finally, viewing the evidence holistically, the jury could find that Cui—a licensed attorney who knew that lying to a federal agent about a material fact of an investigation is a federal crime—lied that the information he provided was accurate to the best of his knowledge. (Dkt. 428 at 3871:7, 3874:12–18). Construing the evidence in favor of the Government, as the Court must do, the Court finds sufficient evidence that Cui's statements were false.

Cui's reliance on Government witness FBI Special Agent Craig Henderson's testimony at trial does not move the needle. When asked what statements of Cui's were false, Henderson replied that if he could "take a look at the transcript," he "might be able to point out a couple statements that were not true." (Dkt. 428 at 3861:18–19). This witness's lack of confidence (and possibly preparation) is not dispositive to the falsity of Cui's statements. The jury evaluated the potentially detrimental nature of Henderson's answers—along with the other evidence presented, including the entire recorded interview between Cui and the agents—in returning their verdict. In fact, the Court instructed the jury to consider the credibility of the witness, the accuracy of the witness's

testimony in light of the evidence presented, and to weigh their testimony accordingly. (Dkt. 384 at 7, 10). The Court will not reweigh their determination now. *See Taylor*, 637 F.3d at 815.

Finally, Cui relies heavily on the fact that he had no prior notice of the interview and was being asked to recall events that occurred over one year earlier. The Court interprets this argument as attacking the jury's finding as to his knowing and willful intent. It is borderline outlandish to posit, as Cui does, that he should have been allowed time to prepare for the FBI interview; his lack of preparation for an unplanned interview with law enforcement does not negate his intent. Under § 1001(a), the "knowingly and willfully" requirement relates "only to the defendant's knowledge and intent that the statements he made to a government entity were false or were made with the conscious purpose of evading the truth." *Lupton*, 620 F.3d at 806 (citing *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984)). Cui's arguments about his surprise, lack of preparation, and outward cooperative demeanor are arguments he made to the jury, but they were free to reject them when evaluating the evidence of his intent. For example, that the interview took place about a year after the events with Burke cuts both ways: though Cui assumes one year constituted a long period of time, a reasonable juror could also have found it to be relatively top-of-mind.

Further, the Court played the full forty minute recording of the interview for the jury upon defense's motion. (*See* Dkt. 363). In its written order admitting the full interview, the Court found it "provide[d] important context" to the interview and Cui's state of mind. (*Id.*) Thus, the jurors had the full ability to evaluate the "substance, context, and tone" of Cui's statements in determining he had a knowing and willful intent. *United States v. Zambrano*, 2021 WL 6125872, at *3 (N.D. Ill. Dec. 28, 2021). Ultimately, Cui relies heavily on his own characterization of the interview, rather than the evidence presented at trial. Viewing the evidence in the light most favorable to the Government, the Court cannot find that the record was devoid of any evidence for which the jury

could Cui find guilty of Count Seventeen. A rational juror could conclude that Cui knowingly and willingly made false and material statements to the FBI.

## II.      Rule 33 New Trial Motion

In arguing for a new trial, Cui reprises largely the same challenges that he brought before and throughout the six-week trial. The Court already addressed and rejected them, and when considering them now, finds no errors weighing in favor of a new trial.

### a.   Legal Standard

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[C]ourts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). In other words, the Court should grant a motion for a new trial "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (quoting *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016)). Unlike a motion for acquittal, the Court need not view the evidence in the light most favorable to the government and it may consider the credibility of the witnesses. *See United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004). But granting a new trial is reserved "for only the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021).

### b.   Section 666 Instructions

First, Cui attacks the Court's jury instructions. Yet, the Court's instructions were sound; there is no error requiring a new trial. The Court instructed the jury accurately in line with the text

23

of § 666, the Government only pursued a bribery theory, and the evidence clearly comported with a bribery theory.

Longstanding Seventh Circuit precedent held that § 666 criminalized both bribes—an agreement to exchange this for that, or a *quid pro quo*—and gratuities—rewards for actions the payee has already taken or committed to take. *See United States v. Snyder*, 71 F.4th 555, 579 (7th Cir.), *cert. granted*, 144 S. Ct. 536 (2023), *and rev'd and remanded*, 144 S. Ct. 1947 (2024). On June 26, 2024, the Supreme Court disagreed, finding that § 666 does not criminalize gratuities accepted for past official acts. *Snyder v. United States*, 144 S. Ct. 1947 (2024). Instead, a state or local official violates § 666(a)(1)(B)—the corresponding provision to § 666(a)(2)—"when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." 144 S.Ct. at 1959.

In light of *Snyder*, Cui argues that to ensure the jury did not convict upon an impermissible gratuity theory, the Court should have explicitly instructed the jury that a *quid pro quo* was required. While *Snyder*'s implications on jury instructions are yet to be determined, the ruling does not mandate the Court give a separate instruction to find a *quid pro quo* to convict on § 666(a)(2), the corresponding provision criminalizing the offer of the bribe. And as the Court noted, Cui completed the crime of bribery when he gave or offered Burke the legal fees in exchange for an official act. *See Suhl*, 885 F.3d at 1113.

In any event, the jury instructions required a *quid pro quo* finding in so many words. Any further instruction was unnecessary: To convict Cui on Count Twelve, the jury had to find that Cui acted with corrupt intent to influence or reward Burke in connection with Burke's official actions relating to the pole sign permit and TIF funding.[7] (*See* Dkt. 384 at 239). In other words, a *quid pro*

---

[7] The Court also retained the language "influence and reward" in line with the Seventh Circuit pattern instructions and text of the statute. The Supreme Court's ruling in *Snyder* makes clear this was proper. Even though "influence and

*quo*: that Cui had "a specific intent to give or receive something *in exchange* for an official act." *Snyder*, 144 S. Ct. at 1962 (Jackson, J., dissenting) (emphasis in original). In fact, § 666's "defining characteristic" is "the corrupt state of mind and the intent to [influence]" an official act." *Id.* at 1956. Most detrimental to Cui's argument, the Government did not pursue a gratuity theory on Count Two. (*See* Dkt. 432 at 4314:3–5). Further, the jury's instructions and the evidence of the case comported with *only* a bribery theory—that there was a *quid pro quo*—and the jury convicted Cui upon that law. *See United States v. Johnson*, 874 F.3d 990, 1011 (7th Cir. 2017) (rejecting similar "hypothetical" gratuity argument based on the facts of the case and that the jury instructions "made [defendant's] conviction contingent on whether he 'acted corruptly with the intent to be influenced' . . . [i]n other words . . . only if the jury found [defendant] accepted bribes.").

Here, the evidence presented supports a bribery, not gratuity, theory: Cui offered Burke legal work in exchange for his engaging in official action on the pole sign permit. *See Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012) (finding harmless error where the evidence presented supported a conviction based on the intentional receipt of bribes without specifically instructing that a *quid pro quo* was necessary). Burke accepted that offer when replying to Cui's email and directing his firm to move forward with the representation. Burke took his subsequent official action with the knowledge and expectation of Cui's offered legal fees. Thus, the evidence, including Cui's own emails to Chin and Reveliotis, lends to the reasonable inference that Cui promised to give Burke's law firm legal work, which prompted Burke's attempt to influence Frydland and Scudiero in the pole sign permit denial. In other words, corrupt intent and a *quid pro*

---

reward" only implicates bribery, not gratuities, the Court understood that "reward" in the statute did not refer to gratuities, but rather "clarifies that a bribe can be promised before, but paid after the official's action." 144 S.Ct. at 1959. In fact, the word "reward" forecloses a defendant from arguing that "the agreement was made before the act but the payment was made after the act . . . [and] therefore could not have 'influenced' the act." *Id.*

*quo*. Given the volume of evidence presented, Cui's speculation that the jury convicted on a gratuity theory is unfounded.

Nor was it necessary for the Court to give Cui's desired instruction of "corruptly" under § 666. The Court instructed the jury that:

> A person acts corruptly when that person acts with the intent that something of value is given or offered to reward or influence an agent of a government in connection with the agent's official duties.

(Dkt. 384 at 239). Cui requested that the Court modify the instruction to add "and acts with the knowledge that giving or offering the thing of value is forbidden." (Dkt. 432 at 4339:12–16; Dkt. 375). Cui based his request on language in the Seventh Circuit's *Snyder* ruling. There, when upholding that § 666 applied to both gratuities and bribes, the court noted the backstop of intent was, "with the knowledge that giving or receiving the award is forbidden." 41 F.4th at 580. In declining to give Cui's proposed instruction, the Court determined that the pattern adequately and accurately described the requisite corrupt intent. (*See* Dkt. 432 at 4340–43). Though Cui focuses on the word "forbidden," *Snyder* did not add an additional element to § 666; the Seventh Circuit was merely elaborating on the importance of the intent requirement to differentiate between unlawful and everyday acts that local and state officials engage.

These same arguments support the Court's decision to decline a special interrogatory on whether the jury convicted Cui upon a gratuity or bribery theory. "Special verdicts are disfavored in criminal cases because they conflict with the basic tent that juries must be free from judicial control and pressure in reaching their verdicts." *United States v. Sababu*, 891 F.2d 1308, 1325 (7th Cir. 1989) (citing *United States v. Jackson*, 542 F.3d 402, 413 (7th Cir. 1976)). Here, the Court is satisfied that the detailed verdict form—which required unanimity for each count—was sufficient such that a special verdict form was unnecessary. *See United States v. Warner*, 2006 WL 2583722,

at *33 (N.D. Ill. Sept. 7, 2006), *aff'd*, 498 F.3d 666 (7th Cir. 2007). For these reasons, the Court finds no error compelling a new trial.

### c. Photoshopped Pole Sign Image

Before trial, Cui moved to bar admission of the photoshopped pole sign image submitted to CDOB Commissioner Frydland. (Dkt. 253). To refresh, the jury heard evidence that Cui emailed his zoning attorney, Tom Moore, with a photoshopped image of the pole sign showing continuous advertising use. (*See generally* Dkt. 317 at 1–5). Cui asked Moore to pass the image along as evidence of continuous use, which would allow the pole sign to potentially be "grandfathered" into use. Moore then emailed the image to Frydland and CDOB First Commissioner Beaudet the following day. However, Beaudet pointed out to Moore and Frydland that the image was photoshopped. Frydland also told Burke's assistant—who then shared with Burke—that Cui submitted a photoshopped image to CDOB.

After considering briefing and oral argument before trial, the Court allowed the image into evidence against both Cui and Burke, finding that it was probative of Cui's state of mind in intending to bribe Burke. (Dkt. 317). Cui now renews his argument that the photoshopped image constituted improper "other act" evidence under Federal Rule of Evidence 404(b) and was unduly prejudicial under Federal Rule of Evidence 403.

Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). First, in allowing the image into evidence, the Court expressed doubt that the image was "sufficiently separable from Cui's charged conduct to be deemed an 'other act,' rather than direct evidence." (Dkt. 317 at 5). The Court reaffirms this finding. Cui engaged in emailing the photoshopped image the same week in which he offered

Burke the legal work as part of his campaign to obtain the pole sign permit. Cui asked his attorney to send the image to Frydland, the individual Cui knew that Burke contacted at CDOB. Cui's actions were part and parcel of the charged crime at issue.

Further, the submission of the photoshopped image was relevant to Cui's motive and intent to bribe Burke during the window of time in which Cui sought Burke's help. *See* Fed. R. Evid. 404(b)(2); *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015) (finding evidence relevant to "another purpose" through "some propensity-free chain of reasoning" is admissible, subject to Rule 403 balancing (quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc)); *see also United States v. Khan*, 771 F.3d 367, 377 (7th Cir. 2014) (explaining that evidence of another bad act must be "similar and close enough in time to be relevant"). Moreover, after viewing the evidence unfold at trial, the Court finds that Cui's argument that the testimony by Frydland, Beaudet, and Moore as to the photoshopped image "inflame[d]" the jury and created a minitrial overstates its prejudice. Within a six-week trial with hundreds of witnesses, only one day of testimony and three witnesses touched on the photoshopped photo. (*See* Dkt. 426 at 3602–11; Dkt. 427 at 3774–78). Though Cui notes that the photoshopped evidence caused the jury to create unflattering opinions of him, every piece of negative evidence does not create undue prejudice under Rule 403. And the Court cabined the introduction of the image to Cui's state of mind. *United States v. Phillips*, 74 F.3d 829, 832 (7th Cir. 2014).

For these reasons, the admission of the photoshopped image also did not constitute a "constructive amendment" of the indictment. (Dkt. 449 at 6–7); *United States v. Rogers*, 44 F.4th 728, 736 (7th Cir. 2022) (finding no broadening of the indictment where the evidence at trial did not establish a crime different from the one charged in defendant's indictment). The jury could not convict Cui based on the submission of the photoshopped image; rather they were properly

instructed as to the elements of his § 666(a)(2) charge, of which the image was relevant to Cui's motive and state of mind.

True, as Cui notes, part of the photoshopped image's relevance was temporal. But the end goal remained the same—to reverse the pole sign permit denial. The timing of Cui's submission of the photoshopped image went straight to Cui's motive and intent to achieve that goal by bribing Burke. And contrary to Cui's naked assertion, there was evidence that Burke was aware of the photoshopped image, prompting the Court to allow it against Burke as well. (*See* Dkt. 287; Dkt. 317). Ultimately Cui could have argued, and the jury rejected, his miscellaneous arguments that he did not direct the photoshopping or had no knowledge of it. The image's admission provides no basis for a new trial.

### d. Testimony of Ray Lang

Next, the Court assumes familiarity with its order denying Defendants' motion for a mistrial and Cui and Andrews' renewed motion for severance. (Dkt. 359). For context, Burke moved prior to trial to preclude Ray Lang, a senior executive at Amtrak, from testifying—as he had to the grand jury—that he believed Burke's involvement in the Post Office redevelopment was "corrupt." (Dkt. 247 at 40). The Government responded that it did "not intend to elicit testimony from [Lang] that Burke's arrangement was 'corrupt.' " (Dkt. 286 at 58). Thus, the motion was moot. (Dkt. 309 at 10). At trial, the Government called Lang to testify in the context of the Post Office episode, in which Cui was not associated. The Government elicited Lang's testimony about Government Exhibit 219, an email he had sent on December 14, 2016 to another Amtrak employee. (*See* Dkt. 410 at 1631–32). The email stated: "Also, the owners of the Old Post Office hired Ed Burke today. Alderman Burke . . . is the longest-tenured alderman in Chicago, first elected in 1969, and a partner in a downtown law firm. A very oldschool Chicago move to hire him." (*Id.* at

1632:13–17). When the Government asked what he meant by "old-school Chicago move," he explained, "I thought [it] was . . . symbolic of the Chicago way of doing business." (*Id.* at 1634:4–5). The Government pressed further, and Lang said, "I mean it's very corrupt." (*Id.* at 1634:8). Upon Burke's objection, the Court promptly struck the question and answer, and instructed the jury: "[Lang's] opinion is not relevant for your determination. You have to determine whether the government meets its burden of proof beyond a reasonable doubt. So you may do that by the evidence in front of you." (*Id.* at 1634:12–16). The Court also cautioned the jury to disregard Lang's stricken testimony before adjourning for the day. (*See* Dkt. 359 at 2; Dkt. 410 at 1665). After considering briefing and oral argument, the Court ultimately denied all Defendants' motions for mistrial, and Defendants Cui and Andrews' renewed motions for severance. (Dkt. 359).

Cui argues that Lang's comment had special prejudice to him, because the jury may have believed that it was "very corrupt" to hire a sitting alderman. Yet, Cui attempts to enlarge Lang's stray remark in the context of a six week trial with over 100 witnesses. As the Court already found, the law and circumstances supported a denial of a mistrial on this testimony. (Dkt. 359); *see, e.g.*, *United States v. Hardin*, 209 F.3d 652, 664 (7th Cir. 2000) (finding no unfair prejudice in seven gang references in a twelve-day trial with forty-two witnesses).

Ultimately, the Court provided sufficient bases for denying the motion for mistrial and renewed motion for severance both orally and in a written opinion during trial. The Court now sees no further incurable prejudice present to Cui. Though Lang's testimony was improper, the Court took quick and effective steps to cure any potential prejudice through admonishing Lang, striking the exhibit that was the basis of the testimony, and giving repeated instructions to disregard the stricken testimony. *United States v. Pierson*, 89 F.4th 976, 986 (7th Cir. 2024) ("We presume that the jury followed the court's instructions absent evidence of an overwhelming probability that

the jury was unable to follow the instructions as given.") (citations omitted)). And even if the jury took Lang's comment about the Old Post Office developers to heart, the Court did not find any incurable prejudice present in the comment by one witness. (Dkt. 599).

Moreover, Lang testified in the context of the Post Office episode, in which Cui was not involved or charged. While Cui construes this fact as implicating improper spillover evidence, the Court finds that the separation of episodes in fact minimized prejudice to Cui. The Court properly instructed the jury that no evidence regarding any other episode should be considered against Cui. (*See e.g.*, Dkt. 407 at 1196:1–8 ("[Y]ou are able to hear only evidence about the Old Post Office. . . . None of this evidence can be considered by you as to Mr. Andrews or to Mr. Cui."); Dkt. 411 at 1693:23–25 ("We're on the Old Post Office incident . . . None of this evidence applies to Mr. Cui."). It is presumed the jury followed these repeated instructions. *Pierson*, 89 F.4th at 986; *Samia v. United States*, 599 U.S. 635, 647 (2023) (quoting *Pa. Co. v. Roy*, 102 U.S. 451, 459 (1880)) (noting the strong presumption that "credits jurors by refusing to assume that they are either 'too ignorant to comprehend, or were too unmindful of their duty to repeat instructions' "); *United States v. Soria*, 965 F.2d 436, 441 (7th Cir. 1992). Further, Cui's argument that the jury somehow equated Burke soliciting the Old Post Office developers in a separate episode with Cui's offering legal work as a bribe for the pole sign  is pure speculation. As the Court noted at the time, the jury was a competent and discerning crew, who carefully combed through the evidence, and by all appearances, followed instructions to the letter. For these reasons, the Court finds no basis to grant a new trial based on Lang's testimony.

### e.  Severance

Moreover, in arguing for a new trial, Cui reprises perceived "spillover effects" of the evidence against Defendants Burke and Andrews. (Dkt. 449 at 11); *United States v. Ervin*, 540

F.3d 623, 628 (7th Cir. 2008). Cui raises no convincing arguments from trial that alter the Court's firm analysis in denying his motions for severance in his pretrial and trial motions. (Dkts. 86, 236, 353). The Court assumes familiarity with these opinions. (Dkts. 196, 287, 359).

As the Court previously explained, severance is proper "if the economy of the joint trial is outweighed by the prejudicial effect of such a trial on one or more (sometimes all) of the defendants." *United States v. Marzano*, 160 F.3d 399, 402 (7th Cir. 1998). A defendant cannot "merely [] show that separate trials might have provided the defendant a better shot at acquittal." *United States v. White*, 737 F.3d 1121, 1133 (7th Cir. 2013) (quoting *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013)). Rather, courts grant severance where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

Throughout each stage of the proceedings, the Court evaluated and found that Defendants Burke, Andrews, and Cui were properly joined for trial under Federal Rules of Criminal Procedure 8(b) and 14(a). Ultimately, Cui's renewed argument that the sprawling evidence presented throughout trial was too "tangled" falls flat as (1) separate trials would not have saved Cui from his entanglement with the charges against Burke; and (2) the evidence against Cui was sufficiently siloed to only the Pole Sign episode. (*See* Dkt. 196 at 180–82; Dkt. 287). Any risk of prejudice to Cui did not outweigh the economy of trying the three defendants jointly.

True, Burke is the anchor for the Indictment's four episodes: the RICO predicate acts charged in Count One form the basis for the Indictment's eighteen other counts, five of which charge Cui. (*See* Dkt. 196 at 175, 180 ("Even though Andrews and Cui did not participate in every predicate act, and each bribe implicated different actors and involved slight wrinkles, their schemes

were part of the same series of acts or transactions" in the Count One RICO charge that forms the backbone of the Indictment)). But while Cui was not alleged to have participated in all four episodes factually underpinning the racketeering enterprise, Cui was *the* main individual implicated in the Pole Sign episode. (*See* Dkt. 287). That the evidence regarding Cui only arose in one episode was all the more conducive to the Court's repeated instructions directing the jury's attention the evidence admissible only to Cui and providing limiting instructions. (*See e.g.*, Dkt. 407 at 1196:1–8; Dkt. 384 at 14, 25, 28; Dkt. 411 at 1693:23–25).

As to the rest of the potential "spillover effects," Cui has only identified isolated issues, rather than any overarching serious risk that a joint trial compromised Cui's right to a fair trial. Instead, Cui's arguments appear be arguments that "separate trials would have given a defendant a better opportunity for an acquittal." *United States v. Warner*, 498 F.3d 666, 700 (7th Cir. 2007); *White*, 737 F.3d at 1133. Many of the issues Cui presented still have not surmounted the uphill battle of (1) the presumption that a jury can competently sort evidence; and (2) the tried-and-true efficacy of limiting instructions. *See United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995) (citing *United States v. Lopez*, 6 F.3d 1281, 1286 (7th Cir. 1993)); *White*, 737 F.3d at 1133–34 (citing *Zafiro*, 506 U.S. at 539). For example, Cui speculates that "multiple limiting instructions would perversely actually increase the chance the jury would conclude that he was in some way involved in the alleged conduct of his co-defendants." (Dkt. 449 at 12). Yet, the Court finds this speculation unfounded and contrary to the law. In fact, the Court explicitly instructed the jury to separately consider the defendants. (Dkt. 384 at  25 ("[Y]ou must consider each defendant and the evidence concerning that defendant separately."), 28 ("You must consider each charge and the evidence concerning each charge separately."); *Ervin*, 540 F.3d at 630 (finding a new trial unwarranted

33

where the court instructed the jury to "consider each count and the evidence relating to it separate and apart from every other count").

For example, Cui raises that (1) in the Government's closing arguments, they made a PowerPoint error by noting the Chicago Ethics Ordinance, and (2) unspecified motions *in limine* rulings that protected Burke but allegedly prejudiced Cui. (Dkt. 449 at 12–15). But he does not connect how any of these occurrences concretely deprived him of a fair trial. For example, the Court sustained Cui's objection to the reference of the Chicago Ethics Ordinance (GX 492) and instructed the jury that Burke's compliance with or violation of the ordinance or code of conduct could not be applied to Cui. (Dkt. 428 at 3960:17–25; Dkt. 434 at 4610–11, 4613:17–22, 4615:2–13 ("The ethics ordinance that is being discussed does not applied to Mr. Cui, at all. And, therefore, any violation of the ethics ordinance cannot be evidence or applies to Mr. Cui in any way, shape, or form."); *see supra* p. 11 (noting that whether Burke complied with local and state ethics ordinances had no bearing on Cui's § 666(a)(2) conviction). Cui has not convinced the Court that any of these isolated instances—which the Court cured immediately and rectified the jury as such—compromised his specific trial rights or prevented the jury from making a reliable determination of guilt or innocence. And Cui's contention that the Court's admission of Cui's August 24, 2017 email to Reveliotis "limited" the "topics" and could have created "different witness testimony" on cross is wholly conclusory and unsupported.  (*See* Dkt. 449 at 15).

Moreover, the trial's outcome supports the finding that the jury properly evaluated each defendant and episode and heeded the Court's instructions. The jury acquitted Andrews, Cui's co-defendant who repeatedly moved for severance as well. Rather than confront the commonsense conclusion that the limiting instructions and jury's understanding of the four episode's distinctions alleviated any potential prejudice of a joint trial, Cui attempts to distinguish Andrews as not a

34

"developer." This arbitrary delineation downplays the jury's understanding of the episodes and specific events where Cui appeared as a character. Further, Cui does not present specific examples of what evidence the jury relied upon from other episodes as to Burke or Andrews to improperly convict Cui. Instead, his arguments sound more in the register of "provid[ing] him with a better opportunity for acquittal," an insufficient basis for a new trial. *Warner*, 498 F.3d at 700.

### f. Insufficient Evidence

Under a motion for a new trial, the Court may set aside the verdict if the evidence "preponderate[s] heavily against the verdict." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (citation omitted). But this is an exacting standard. In fact, motions for a new trial based on the weight of the evidence, "are not favored" and should be "grant[ed] . . . sparingly and with caution . . . only in those really exceptional cases." *Id.* (cleaned up).

Cui argues that the Court should grant a new trial because the evidence was "so thin." (Dkt. 449 at 15–16). First, this argument, consisting of one sentence, is skeletal and speculative. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments . . . are waived."). Even so, the Court rejected those arguments under Rule 29. There was sufficient evidence for the jury to find Cui guilty of all counts on which he was convicted. Thus, the Court sees no basis to grant a new trial for insufficient evidence.

### CONCLUSION

For the reasons explained above, the Court denies Cui's Motion for Judgment of Acquittal and for a New Trial [379] [448] [449].

Virginia M. Kendall
United States District Judge

Date: August 16, 2024